

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | No. SC92720 |
| | ) | |
| CHRISTOPHER L. COLLINGS, | ) | |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY
The Honorable Mary Sheffield, Judge

*Opinion issued August 19, 2014*

Christopher L. Collings (hereinafter, "Collings") was tried and found guilty by a jury of first degree murder pursuant to section 565.020, RSMo 2000.[1] Collings was sentenced to death, consistent with the jury's recommendation. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3. For the reasons set forth below, this Court finds no reversible error in any of the points raised and the sentence imposed is proportional to the crime as required under section 565.035.3. The circuit court's judgment is affirmed.

### Factual and Procedural History

Nine-year-old Rowan Ford (hereinafter, "Rowan") lived with her mother, Colleen Munson (hereinafter "Colleen"), and her stepfather, David Spears (hereinafter, "Spears") in Stella, Missouri, located in Newton County. Spears had been friends with Collings for

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

many years. Collings lived with Spears' family for several months during the summer and fall of 2007. Collings slept in the basement, and Rowan referred to him as "Uncle Chris." Collings moved to his family's farm in late October 2007 and lived in a travel trailer on the property, located in Wheaton, Missouri, in Barry County.

On the evening of Friday, November 2, 2007, Nathan Mahurin (hereinafter, "Mahurin"), a mutual friend of Collings and Spears, met them at a farm where they were working. They went to a liquor store to buy two or three six packs of malt liquor and then went to Spears' home to play pool and drink. At 8:30 p.m., Colleen left for work and left Rowan in Spears' care. The men continued to drink after purchasing more alcohol.

Later that evening, Collings asked Mahurin to drive him home. Mahurin and Collings talked Spears into going with them and leaving Rowan home alone, asleep on the floor in her bedroom. On the way to Collings' trailer, the men stopped to buy more alcohol. At Collings' trailer, they continued to drink and smoked marijuana. After an hour, Mahurin and Spears left to go home. Mahurin decided to take the back roads instead of the direct highway route to Spears' house because he was intoxicated and he did not want to get stopped by the police. Mahurin dropped off Spears and returned home by midnight.

On November 3rd, Colleen returned home from her overnight work shift at 9:00 a.m. and could not find Rowan. After searching the house, Colleen woke Spears and asked him where Rowan was. Spears told Colleen that Rowan was staying with a friend, but he could not identify the friend. Colleen walked the neighborhood searching for

Rowan to no avail. Colleen wanted Spears to call the police, but he insisted Rowan was at a friend's house. When Rowan did not return that afternoon, Colleen contacted the Newton County sheriff's department to report Rowan missing, at which time a large scale search was launched to find her. Spears, Mahurin, and Collings were all considered "persons of interest" because they were the last people to see Rowan at the house.

On November 4th, Newton County deputies spoke with Collings on the parking lot of a local restaurant about Rowan's disappearance. Collings gave the deputies the same account Mahurin did about their activities that evening, but omitted that they had smoked marijuana. Collings told the deputies he stayed home and went to sleep after Mahurin and Spears left. Collings denied speaking to Spears since he left and claimed he was unaware Rowan was missing until the police spoke to him. The deputies described Collings as cooperative, concerned, and polite. Later that evening, Collings visited Colleen at her home, asked how the search was going, and offered to help find Rowan.

On November 5th, the FBI became involved in the investigation. While Newton County deputies continued to interview Spears, FBI technicians seized and searched Spears' pickup truck and a vehicle Spears' mother said she loaned Spears after Mahurin dropped him off on the night Rowan disappeared. In the meantime, Newton County deputies approached Collings at work and requested he answer more questions. Collings agreed and drove himself to the sheriff's department. Collings gave a similar statement to the one he had given the day before. Collings was read his *Miranda* rights after being questioned about Spears' potential involvement in Rowan's disappearance. Collings indicated that he understood his rights and waived them. Collings also agreed to submit

3

to a polygraph test and a Computer Voice Stress Analysis (CVSA) test.[2] Collings was read his rights again prior to testing and waived them. After the testing was completed, Collings spoke to the deputies. Collings insisted he knew nothing about Rowan's disappearance and offered to help in the search.

Later that afternoon, Wheaton Chief of Police Clinton Clark (hereinafter, "Chief Clark") was on routine patrol in Wheaton. Collings and Chief Clark had a relationship spanning seventeen years. Chief Clark had known Collings since he was a young boy, he was close friends with Collings' adoptive mother, and he knew Collings' adoptive father. Collings trusted Chief Clark and turned to him for advice, sought solace from him when Collings' mother died, and made a point to visit Chief Clark when he came to visit when he lived out of town.

Collings flagged down Chief Clark, told him that Rowan was missing, and he was trying to find her. Chief Clark described Collings as "kind of excited" and "not his normal self." Chief Clark encouraged Collings to continue to do what he could to help find Rowan. After speaking to Collings, Chief Clark notified the FBI that Collings contacted him about Rowan's disappearance. Chief Clark told the FBI that he and Collings had a long-standing relationship and a good rapport. Chief Clark believed Collings knew something about Rowan's disappearance and offered his help in the investigation. Chief Clark was encouraged by the FBI and Newton County deputies to continue to talk with Collings.

---

[2] Testimony about these tests was admitted during the suppression hearing but not during the trial.

That evening, Collings went to Colleen's home to speak to her about the investigation. The FBI spoke to Colleen and Collings individually at Colleen's home. Collings was described as cooperative, and he gave the same account of the evening's activities as he had given previously. Collings spoke about his relationship with Spears, told the FBI he believed Spears was involved in Rowan's disappearance, and offered to wear a wire to help the investigation. Collings also suggested locations in which to search for Rowan.

On November 6th, law enforcement officials continued to search for Rowan, but the focus of the investigation was on Spears. Spears was interviewed repeatedly, his home was searched, and he was driven around the area in an effort to find Rowan. In the late afternoon or early evening, Collings went to Chief Clark's office to let him know he had spoken to the FBI and was active in the search to find Rowan, even suggesting places for them to search. Chief Clark believed Collings "had something on his mind" and appeared "apprehensive." Collings would not make eye contact with Chief Clark, which was unusual. Chief Clark told Collings that he knew how to contact him if he needed help with anything. After this conversation, Chief Clark contacted the FBI and told them about his talk with Collings. The FBI believed if Collings were going to confess or reveal any information, it would be to Chief Clark. Hence, the FBI encouraged Chief Clark to help in the investigation, to which Chief Clark agreed.

On November 7th, Collings met with the FBI at the Newton County sheriff's department. Collings consented to provide a buccal swab for DNA testing. Collings executed consent forms to search a safe he owned located at Spears' home, his property,

5

and trailer. Collings submitted to additional testing, which required a voluntary waiver of his rights. Afterwards, Collings was interviewed, but not Mirandized. Collings spoke with the FBI about an alibi Spears presented for the night Rowan disappeared, which Collings said was untrue. As the interview progressed, Collings became more emotional, tense, and nervous when asked about Rowan. Collings told the agents that if they were going to accuse him of being involved with Rowan's disappearance, he was not going to talk to them anymore. This concluded the interview.

In the evening, Collings went to Chief Clark's office and was very upset about his FBI interview that day. Collings told Chief Clark he was going to "dummy up about anything else…," and maybe he needed to get a lawyer. Chief Clark told Collings that was his right, but he also encouraged Collings to continue to do anything he could to help find Rowan and stated it was not in his best interest to stop cooperating. Collings told Chief Clark, "[I]f I have anything else to say, I'll talk to you." Chief Clark then advised Collings of his *Miranda* rights. Collings agreed to speak and signed a waiver form. Chief Clark told Collings he felt there was something on his mind and asked if he knew anything about Rowan's disappearance. Collings began to cry and stated he always loved Rowan and would not have done anything to hurt her. At this point, someone came into the police department, interrupting their conversation, which caused Collings to leave abruptly.

Chief Clark contacted the FBI after his discussion with Collings. Chief Clark informed them he believed Collings was "near a breaking point" and suggested Collings needed a day off from questioning. Chief Clark further advised Collings was "about to

6

lawyer [up]" and he tried to dissuade him from doing that and encouraged him to continue to cooperate.

On November 8th, Collings had no contact with law enforcement. Chief Clark spoke with the FBI about Collings, the dynamics of his family, and Chief Clark's unique relationship with him. Chief Clark thought Collings knew something about Rowan's disappearance but believed they needed to find her body first. The FBI told Chief Clark once they found Rowan's body, they wanted him to be the one to speak to Collings.

On November 9th, Rowan's body was discovered at the bottom of a sinkhole known as Fox Cave. The sinkhole was twenty to thirty feet from the road in a heavily wooded area. Rowan was nude from the waist down, except for one sock. She had a ligature mark around her neck and trauma, blood, and tissue damage to her vaginal area. She was covered with leaves and debris.

Chief Clark heard about Rowan's body being found on the news that morning. He received a page from his office that Collings came by asking for him and inquired about what time he came on duty because Collings needed to speak to him. Chief Clark was contacted by the FBI, who directed him to find Collings and tell him that they found Rowan's body.

Chief Clark went looking for Collings, but to no avail. Collings called Chief Clark on his cellular telephone and asked if law enforcement officers were following him in a gray minivan. Chief Clark denied knowing about any surveillance being conducted. Collings relayed how he had been driving "all over the area … trying shake it" and that he was nervous and felt threatened. Chief Clark advised Collings to go to the police

department, but Collings suggested they meet up.

After they met, Collings told Chief Clark they needed to talk and agreed to ride back to the police department in Chief Clark's patrol car. They discussed the gray minivan, and Collings indicated he was worried that people might take matters into their own hands now that Rowan's body had been recovered. Chief Clark told Collings he could not protect him twenty-four hours a day and could not guarantee his safety.

When they arrived at the police department, Chief Clark read Collings his *Miranda* rights. Collings indicated he understood his rights and agreed to talk. Chief Clark told Collings, "[W]ell, son, it's over…. We found Rowan's body this morning." Collings dropped his head and his eyes began to water. Chief Clark believed Spears "had done something" to Rowan and suspected Collings had knowledge of what Spears did. Chief Clark told Collings he needed to tell him what Spears did to Rowan, to which Collings reacted with surprise and looked at Chief Clark "kind of funny." The police department was busy and Collings indicated he did not want to talk with so many people nearby. Chief Clark recommended they go somewhere quiet to talk. Collings suggested they go to the Muncie Bridge, located a few miles outside of Wheaton.

Chief Clark contacted law enforcement officials to inform them he and Collings were headed to the Muncie Bridge. After they arrived, Collings held his hands out, indicating Chief Clark ought to handcuff him. Chief Clark stated that was not necessary, to which Collings replied, "[F]or what I am about to tell you, you will." Collings and Chief Clark sat on a slope near the bridge, and Collings told him what occurred the evening Rowan disappeared.

Collings relayed the same story he maintained all week about his activities up until the time Mahurin and Spears left his trailer. Collings confirmed that Mahurin and Spears took the back roads home to avoid being detected because they wanted to finish drinking and smoking marijuana. Collings told Chief Clark he knew if he hurried, he could get back over to Spears' house and get Rowan "out of there" before the other men returned. Collings took the highway, which was the "quickest route" back to Spears' house. Once back at Spears' house, Collings went in, used the bathroom, and retrieved Rowan off of the floor in her bedroom. Collings carried Rowan, who was still sleeping, outside and put her inside his pickup truck. Rowan remained asleep during the drive back to Collings' trailer. Collings carried Rowan inside, placed her on the bed, and removed her pajama pants and underwear. Collings did not speak to Rowan so she would not recognize his voice and kept the lights off so that she would not see him. Collings then said, "I had sex with her" in the "missionary position" and also "used my finger a little bit." Rowan woke up when Collings penetrated her, struggled at first, and then stopped. Intercourse lasted a few minutes, and Collings could not remember if he ejaculated.

Afterward, Collings told Chief Clark he intended to return Rowan to her house. Collings said he took Rowan outside; he held her in front of him by her arms and facing away from him so she would not see his face. Rowan looked back over her shoulder and could see Collings in the moonlight. Collings knew Rowan recognized him and "freaked out." In an old pickup truck sitting on the property, Collings saw a coil of "chicken house rope" and looped it around Rowan's neck. Collings remained behind Rowan and pulled the rope tight around her neck with his fists clenched, pulling his arms away from

9

each other.  Rowan struggled, but Collings said he "kept it tight" even after Rowan stopped struggling and fell to the ground.  Eventually, Rowan stopped moving.

Collings realized he "was in a lot of trouble" and put Rowan's body in the bed of his pickup truck.  Collings planned to dispose of Rowan's body off of the Muncie Bridge, but rejected that idea because he thought her body would be discovered too quickly.  As Collings drove around considering his options, he decided to go to Fox Cave.  Collings told Chief Clark he threw Rowan's body into the sinkhole and tried to pull some branches and limbs over to cover the entrance to the sinkhole, but it was too big and the debris fell inside.

Collings got back into his pickup truck and returned to his trailer.  At the trailer, Collings discovered blood on his mattress and his clothes, which he did not remove when he had sex with Rowan.  Collings said he knew he needed to get rid of these items, in addition to Rowan's pajama pants, her underwear, and the rope he used to strangle her.  Collings put everything except the mattress into a wood stove and burned it.  Collings rolled up the mattress and put it into a fifty-five gallon drum used as a burn barrel with some old carpet.  Collings said, "I got to thinking, now that's gonna make a hell of a fire.  Somebody's gonna see that burning."  Collings then dragged the barrel into a barn and set the contents on fire to avoid detection.

When Collings finished talking, he and Chief Clark returned to the Wheaton police department because Chief Clark wanted the other law enforcement officials involved in the investigation to hear Collings' story.  During the ride back to the police department, Collings rode in the front seat, smoked a cigarette, and was not handcuffed.

10

Collings was advised of his rights, and deputies from Barry and Newton County, along with the FBI, listened as Collings repeated his confession. Collings executed a consent form to allow a search of his property during this interview. This interview was not recorded.

Afterward, Collings was transported to the Barry County sheriff's department, where he gave a videotaped statement after being advised of his rights. Collings said on the videotape he had been advised of his rights "several times" throughout the week. Collings repeated the same series of events during the first videotaped statement. Collings felt guilty and remorseful and said he had been "bawling like a baby all afternoon."

Collings' confession was surprising to the investigators because they were operating under the assumption that Spears killed Rowan and Collings merely had knowledge of the event. As a result, Newton County deputies questioned Spears again, at which time Spears implicated himself. Upon learning this, Collings was questioned again at Barry County in a recorded interview. The deputies and Chief Clark told Collings that Spears stated he called his mother, had her bring a vehicle to his home, and then he joined Collings back at his trailer. Spears stated he also had sex with Rowan, was there when Collings killed her, and helped Collings dispose of her body. Collings vehemently and repeatedly denied Spears had any involvement in Rowan's rape, murder, and disposal of her body.

Collings' trailer and adjacent properties were searched while Collings gave the second videotaped statement. Among the items collected were: a rusted metal spool

inside the bed of an old pickup truck; a piece of string or twine found on the driver's side floor of the old pickup truck; rope or wire found inside Collings' pickup truck; a fifty-five gallon drum with burned remnants inside; a burn pile that contained an item appearing to be a cord; ashes collected from a woodstove; and a light-to-medium brown hair, found in the bed of Collings' pickup truck.

The autopsy revealed Rowan died from ligature strangulation. Rowan was conscious for approximately ten seconds, quit breathing after approximately two to three minutes, and would have been brain dead in approximately twelve minutes. Rowan's body had signs of decomposition. The body had additional small scrapes, bruises, and injuries inflicted prior to death and significant facial trauma likely inflicted after her death as a result of being thrown into the sinkhole. The body also had a laceration approximately 3/4 of an inch long from her vagina to her anus. This laceration was consistent with blunt force trauma inflicted by a penis, which caused significant bleeding and would have been very painful. During the autopsy, a rape kit was collected, including vaginal swabs, blood samples, and two foreign hairs from Rowan's pubic area.

Collings was charged with one count of first degree murder, one count of forcible rape, and one count of statutory rape. The murder charge was severed from the rape charges, which later were dismissed. Venue was changed to Phelps County, and a jury was selected from Platte County.

Collings filed a motion to suppress, seeking to exclude evidence of all statements taken from him by law enforcement agents throughout the entire investigation and all evidence obtained from the searches of his body, pickup truck, trailer, and property. The

circuit court overruled Collings' motion, finding Collings was not in custody for any of the interviews until November 9th, after he returned to the Wheaton police department with Chief Clark and met with other law enforcement officers to give a statement.

At the conclusion of the guilt phase, the jury found Collings guilty of murdering Rowan. During the penalty phase, the State presented victim impact testimony from six witnesses. Collings presented two witnesses who offered testimony about Spears' potential involvement in Rowan's murder. Collings' family members testified describing Collings' tumultuous upbringing, his shuffling back and forth between his biological and adoptive parents who had significant substance abuse and legal issues, and the issues he encountered as a teenager and young adult. Collings also presented testimony from an expert in the field of human development that explained Collings was handicapped developmentally due to severe emotional neglect during the first six months of his life and beyond. As a result, the expert testified Collings suffered confusion in his connections with other people that resulted in a diagnosis of "severe disorganized disassociative attachment disorder" and "intermittent explosive personality disorders."

After the penalty phase, the jury recommended a sentence of death. The jury found Rowan's murder involved torture, and, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhumane. The jury also determined Rowan was a potential witness in a pending investigation of her rape and was killed as a result of her status as a potential witness. Collings was sentenced to death and now appeals.

## Standard of Review

This Court reviews a sentence of death on direct appeal for prejudice, not just mere error. *State v. McFadden*, 369 S.W.3d 727, 736 (Mo. banc 2012). This Court will reverse a circuit court's decision only when an alleged error is so prejudicial that the defendant was deprived of a fair trial. *State v. Johnson*, 284 S.W.3d 561, 568 (Mo. banc 2009). Prejudice exists when there is a reasonable probability that the circuit court's error affected the outcome at trial. *Id.* Evidence admitted at trial is reviewed in the light most favorable to the verdict. *McFadden*, 369 S.W.3d at 736. Issues that were not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the circuit court error. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009); Rule 30.20.

## Point I – Motion to Suppress

Collings argues the circuit court erred in overruling his motion to suppress his November 9th statements and physical evidence and admitting them at the trial in violation of his right to be free from self-incrimination and unreasonable searches and seizures. At his suppression hearing, Collings challenged each contact with every law enforcement official as coercive and involuntary. Collings argues the totality of the circumstances shows that he did not confess voluntarily and with a full understanding of his *Miranda* rights. Collings raises several claims within this point to support his argument.

"At a motion to suppress hearing, 'the state bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that

14

the motion to suppress should be overruled.'" *State v. Faruqi*, 344 S.W.3d 193, 199 (Mo. banc 2011) (quoting *State v. Franklin*, 841 S.W.2d 639, 644 (Mo. banc 1992)). The circuit court's decision to overrule a motion to suppress evidence will be reversed only if it is clearly erroneous. *State v. Bowman*, 337 S.W.3d 679, 684 (Mo. banc 2011). The evidence is viewed in the light most favorable to the circuit court's ruling, and this Court defers to the circuit court's credibility determinations. *State v. Johnson*, 207 S.W.3d 24, 44 (Mo. banc 2006). Whether the conduct at issue violates the Fourth Amendment is an issue of law that an appellate court reviews *de novo*. *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007).

"*Miranda* rights inform a criminal defendant of his constitutional rights during the interrogation process." *Johnson*, 284 S.W.3d at 582. Missouri defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody ...." *State v. Gaw*, 285 S.W.3d 318, 321 (Mo. banc 2009). "Statements obtained during a custodial interrogation not preceded by *Miranda* warnings are subject to suppression at trial." *State v. Stover*, 388 S.W.3d 138, 155 (Mo. banc 2012). The State bears the burden of proving the challenged statements complied with the guidelines established in *Miranda* and that the statements were voluntary. *Johnson*, 284 S.W.3d at 582.

*Exploitation of Friendship with Chief Clark*

Collings claims law enforcement officers impermissibly exploited the close friendship he had with Chief Clark. Collings asserts Chief Clark used the "false friend" technique to induce him to confess because Chief Clark knew he had a close, long-

15

standing, father-figure relationship with Collings. As a result of this relationship, Collings asserts Chief Clark made him believe that he was advising Collings as a friend, not a law enforcement officer, and that he was acting in Collings' best interest. Collings asserts other law enforcement officials knew of this relationship and encouraged Chief Clark to continue to speak to Collings until he produced a confession. Collings cites *Spano v. New York*, 360 U.S. 315 (1959), to support his claim.

In *Spano,* the police attempted to secure a confession from a defendant after he was involved in a fatal shooting. *Spano*, 360 U.S. at 317. The defendant was subjected to several hours of continuous questioning by many law enforcement officials during the overnight hours. *Id*. at 317-19. The defendant steadfastly refused to answer any questions posed to him on the advice of counsel until the police sent a childhood friend, who was a young police officer, to speak to him. *Id*. at 318-19. The childhood friend attempted to obtain a confession three separate times, stating he would lose his job, which would lead to trouble for his pregnant wife and young children, if the defendant did not give him a statement. *Id*. The defendant finally succumbed to his childhood friend's questioning after a fourth attempt in the early morning hours. *Id*. The United States Supreme Court found the defendant's confession was rendered inadmissible because it was unduly coercive. *Id*. at 323. The Court specifically found the use of the "false friend" technique by the defendant's childhood friend to extract a confession was a relevant factor when examining the totality of the circumstances. *Id*.

Here, Collings makes much of the fact that his relationship with Chief Clark was exploited by law enforcement to get him to confess, just as the police did in *Spano*.

16

However, the evidence demonstrated that law enforcement spent the entire course of the investigation focusing on Spears as a primary suspect. While law enforcement believed Collings would be more amenable to talking to Chief Clark due to their relationship, it also was believed Collings only had information or knowledge of Spears' involvement, not that Collings was responsible for Rowan's disappearance.

Moreover, there can be no doubt Collings knew he was speaking to Chief Clark in his capacity as a law enforcement officer during each encounter, rather than as a trusted friend. Collings initiated every contact with Chief Clark during the investigation by going to his office at the police department and calling him on his office cellular telephone when it pertained to the investigation. On November 9th, Collings called Chief Clark's office and asked when he came on duty so Collings could speak to him. Earlier in the week, after expressing frustration with other law enforcement officials, Collings told Chief Clark, "[I]f I have anything else to say, I'll talk to you." Collings admitted he wanted to tell Chief Clark as early as Monday about his part in Rowan's disappearance and had other opportunities to do so as well, but chose not to confess. All of these circumstances demonstrate Collings' state of mind that Chief Clark, while being someone he could trust and confide in, was acting as an active member of law enforcement investigating Rowan's disappearance, not as a "false friend" attempting to extract a confession out of him.

*Use of "Two-Step Interrogation"*

Collings argues law enforcement officers engaged in an unlawful "two-step interrogation" wherein he was questioned first, then Mirandized afterward, to secure a

17

confession. Collings argues this technique violates the holding in *Missouri v. Seibert*, 542 U.S. 600 (2004), because he was in custody when he gave his confession at the Muncie Bridge but claims he was not Mirandized until after he returned to the Wheaton police department for further interviewing. Collings claims the use of this technique rendered his confessions inadmissible.

A "two-step interrogation" is "a police protocol for custodial interrogation that calls for giving no warnings of the right to remain silent and counsel until interrogation has produced a confession … then [issuing] *Miranda* warnings … then lead[ing] the suspect to cover the same ground a second time." *Seibert*, 542 U.S. at 604. The issue in *Seibert* was whether the second, repeated statement was admissible. *Id*.

In *State v. Gaw*, this Court adopted Justice Kennedy's opinion concurring in the result in *Seibert* as the test Missouri employs to determine whether a "two-step interrogation" has occurred, rendering repeated statements made to police inadmissible. *Gaw*, 285 S.W.3d at 323. "[A] confession is inadmissible despite a belated *Miranda* warning where a 'two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.'" *Id.* (quoting *Seibert*, 542 U.S. at 622). This is "a subjective test that relies on a finding of fact by the trial court (made specifically or implied) that the arresting officer was deliberately trying to skirt the protections of *Miranda*." *Id*. at 322.

When viewing the evidence in the light most favorable to the circuit court's ruling, and deferring to the circuit court's credibility determinations, this Court finds the record refutes Collings' claim that Chief Clark engaged in a "two-step interrogation" with him

18

on November 9th. Chief Clark testified at the suppression hearing that he advised Collings of his *Miranda* rights prior to leaving for the Muncie Bridge and asking any questions about Collings' involvement in Rowan's disappearance; Collings testified otherwise. The circuit court resolved the conflict as to when Collings first received *Miranda* warnings that day when it determined he was Mirandized prior to going to the Muncie Bridge, even though the circuit court also determined Collings was not in custody at that time. There was no other evidence demonstrating Chief Clark deliberately tried to skirt the protections of *Miranda* on November 9th either before or after the Muncie Bridge confession.

*Exploitation of Fear of Vigilante Justice*

Collings claims law enforcement officers exploited his fear of vigilante justice in order to induce him to confess. Collings testified at the suppression hearing that he overheard people speaking at a local restaurant about vigilante justice for Rowan, and he was worried they might take matters into their own hands. Collings also expressed concern on the day he confessed to Chief Clark that he was being followed by someone in a gray minivan and that he feared for his safety. Collings asked during one of the videotaped interviews that he be segregated from the other detainees because he feared for his safety.

Despite Collings' fears that stemmed from the community's purported need for vigilante justice, law enforcement officials were not the source of any coercion or pressure for Collings to confess in that respect. Chief Clark repeatedly told Collings he could not protect him "twenty-four hours a day" but this was no different than any other

citizen in Wheaton. Chief Clark testified at the suppression hearing that he did not condition protecting Collings on Collings' willingness to speak to him. Chief Clark took measures to keep Collings safe, and any statement to that effect was borne out of Chief Clark's duty as a police officer. Moreover, Collings' subjective belief is refuted by the record in that Collings repeatedly stated during the recorded interviews that his statement was not coerced due to threats of any nature.

*Totality of the Circumstances*

Finally, Collings points to other factors that he believes rendered his confession involuntary and unreliable. Collings argues he was worn down by persistent questioning all week by various law enforcement officials. However, Collings voluntarily subjected himself to repeated questioning and testing, and he consented to searches throughout the week after being advised of his rights and having the opportunity to refuse to cooperate. Collings also claims the various consent forms he signed were "riddled with problems." Yet, the circuit court determined Collings was never in custody until after he returned from the Muncie Bridge. Moreover, Collings testified at the suppression hearing about voluntarily executing the consent forms. Finally, Collings repeatedly asserted during the videotaped interviews that he was not threatened, no promises were made to him, he signed the *Miranda* waiver of his own free will, and he understood his rights after having heard them "several times" throughout the week. The circuit court did not clearly err in overruling Collings' motion to suppress for any of the reasons asserted because his statements were given voluntarily after being advised of his *Miranda* rights.

20

**Point II – Admissibility of Evidence at Suppression Hearing**

Relatedly, Collings claims the circuit court plainly erred in barring him from presenting relevant, probative evidence at the suppression hearing while at the same time allowing the State to present evidence that was inadmissible or had scant probative value. Collings argues the circuit court's inconsistent rulings violated his right to due process, to present a defense, confrontation, cross-examination, a fair and reliable suppression hearing, and freedom from cruel and unusual punishment. Collings concedes he has not preserved these issues for appeal, and therefore, requests plain error review.

Circuit courts retain wide discretion over issues of relevancy and admissibility of evidence, and this Court will not interfere with those decisions unless there is a clear showing of an abuse of discretion. *State. v. Johnson*, 406 S.W.3d 892, 903 (Mo. banc 2013). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *State v. Tisius*, 362 S.W.3d 398, 407 (Mo. banc 2012) (quoting *State v. Anderson*, 306 S.W.3d 529, 538 (Mo. banc 2010)). Collings failed to demonstrate the circuit court erred, plainly or otherwise, in ruling on any of these evidentiary issues.

*Admissibility of November 14th Videotape*

Collings argues the circuit court plainly erred in barring him from presenting a videotaped conversation Collings had with Chief Clark on November 14, 2007, while in custody, after being arraigned. Collings claims this videotape offers the best evidence by which the circuit court could gauge the relationship between Collings and Chief Clark, determine Chief Clark's credibility, and assess the reliability of Chief Clark's testimony

that he did not pressure Collings or otherwise violate his rights during the Muncie Bridge confession.

Collings was arrested on November 9th, appointed counsel, and arraigned on November 13, 2007. Chief Clark was present at the arraignment and heard defense counsel advise Collings to not speak to anyone about his case. On November 14th, Collings asked to speak to Chief Clark about a personal legal matter unrelated to the murder case. When Chief Clark arrived, he Mirandized Collings prior to engaging in conversation. Chief Clark told Collings he was instructed not to discuss anything with him until Collings answered additional questions about Rowan's murder and explained the inconsistencies between his statement and Spears' statement. Chief Clark told Collings, "I have some questions in my mind that I really wish that you would help me with, if you will." Collings responded, "Well, it depends. If it's about my case, I can't -- I was advised by my lawyer not to talk to anybody as far as my case."

Instead of terminating the discussion at this point, the conversation continued for approximately forty minutes. Chief Clark repeatedly asked Collings to "clear up details," "explain discrepancies," "put things at ease," and urged Collings to "get this over with and get it behind [him]" regarding the questions Chief Clark felt were still unresolved about the case. Chief Clark repeatedly explained to Collings that he was "not going to pressure or force," "attempt to coerce," and would "never dream of pressuring or coercing" Collings into answering any questions. Collings stated unequivocally, at least nine times, that he could not answer any questions regarding the case on the advice of counsel. Each time Collings invoked his rights, Chief Clark acknowledged them, but

22

continued to pose questions and interject personal comments about their relationship in an effort to get Collings to speak. Collings told Chief Clark he did not agree with the murder charges lodged against him and said, "This is well out of your hands at this point." Chief Clark responded, "Let me tell you something, son. It's not out of my hands as much as you think. I told you I would stand by you and would -- would be there for you all the way, all the way through to the extent that I could, and I have done that, and I will continue to do that. But I can only do that to the extent that you allow it." Nevertheless, Collings refrained from answering any of Chief Clark's questions.

At the suppression hearing, Collings attempted to admit the November 14th videotape into evidence, arguing the videotape would permit the circuit court to see the nature of his and Chief Clark's interactions while they were alone, how Chief Clark pressured Collings, and how his constitutional rights were disregarded. Collings argued this videotape went straight to the issue of Chief Clark's credibility regarding his testimony at the suppression hearing that he did not believe he pressured or coerced Collings into confessing to Rowan's murder on the Muncie Bridge and was admissible as part of the totality of the circumstances.

The State objected to the admission of the videotape. It recognized the videotape would be inadmissible at trial due to Chief Clark's blatant disregard for Collings' constitutional rights. The State further argued Collings could not "bootstrap" the issue of voluntariness by way of this videotape due to the fact that it occurred five days after Collings was arrested, represented by counsel, and arraigned. The circuit court permitted

23

Collings to play the videotape as part of an offer of proof, but the circuit court ultimately sustained the State's objection.

This Court is troubled deeply by Chief Clark's egregious and blatant violation of Collings' constitutional rights while knowingly being recorded. However, the record refutes Collings' claim that the circuit court failed to consider the videotape for his intended purpose. In overruling Collings' motion to suppress, the circuit court found the November 14th videotape did not operate to invalidate Collings' voluntary statements made through his confessions on November 9th. This ruling demonstrates the circuit court considered the videotape on its merits when ruling on whether Collings' confessions were voluntary. The fact that the circuit court found the videotape unavailing does not mean Collings was barred from presenting the evidence. Further, the fact that Collings was able to invoke his rights and withstand Chief Clark's repeated barrage of inappropriate and illegal questioning undercuts his argument of coercion.

Finally, the record further refutes Collings' claim regarding Chief Clark's credibility. Collings testified at the suppression hearing and used the phrase "badgering and pestering" to characterize his interaction with other law enforcement officials. However, Collings never once indicated Chief Clark threatened, pressured, or coerced him into speaking during any of the times he sought out Chief Clark to talk.

*Use of "False Friend" Police Tactic*

Collings next argues the circuit court plainly erred in not considering evidence that demonstrated law enforcement officers used the "false friend" tactic while interrogating Spears. Collings claims this evidence was relevant to show law enforcement

24

intentionally preyed upon the vulnerabilities of the suspects by using trusted friends to elicit incriminating statements. Collings believes the circuit court erred in refusing to consider this evidence as part of the totality of the circumstances.

During the suppression hearing, Collings sought to elicit testimony that just as Chief Clark was encouraged to keep contacting and questioning Collings due to their personal relationship, law enforcement brought in Mark Bridges (hereinafter, "Bridges") to speak to Spears. Bridges was the Newton County coroner and Spears' former employer. Bridges and Spears had known each other a long time and had a good rapport. Collings attempted to show law enforcement asked Bridges to wear a wire in an attempt to record Spears implicating himself in Rowan's murder. The State objected, and the circuit court sustained the objection. Collings made an offer of proof showing law enforcement arranged for Bridges to wear a wire around Spears in an attempt to record incriminating statements.

Collings argues he wanted to demonstrate that the law enforcement officers investigating Rowan's murder made it a pattern to enlist friends of the suspects in an effort to secure confessions. A review of the record demonstrates Collings was not foreclosed from inquiring about law enforcement's use of Bridges to elicit a statement from Spears. Collings was able to present evidence of their friendship, the fact that Bridges was not a law enforcement officer, and that he was fitted with a wire to record any incriminating statements Spears made. Defense counsel also set forth the detailed arguments regarding the parallels to be drawn between Bridges and Spears, and Chief

Clark and Collings. The circuit court did not hinder Collings from developing this evidence or exclude any other evidence Collings wished to present on this issue.

*Admission of Polygraph and Uncharged Bad Acts*

Collings claims the circuit court's rulings regarding the admissibility of the November 14th videotape and the evidence of law enforcement's repeated use of the "false friend" tactic are inconsistent with its other rulings permitting the State to present evidence that is likewise inadmissible, including evidence of a polygraph examination, the CVSA test, and evidence of uncharged, other bad acts. Collings argues these inconsistent rulings violated notions of fair play by barring relevant, probative defense evidence while considering the State's improper and prejudicial evidence.

At the suppression hearing, the State presented evidence that Collings voluntarily took a series of tests and conceded the results of those tests would not be admissible at trial. However, the State reasoned that the circuit court should consider these tests because Collings executed consent forms or waived his rights when participating in these tests. The State argued the consent forms and waivers were relevant to demonstrate Collings' contact with law enforcement and his awareness of his rights as a part of the totality of the circumstances. The circuit court ruled the State could elicit that Collings took tests and consented prior to those tests, but it could not say what the tests were for or disclose the test results.

"The results of a polygraph examination generally are inadmissible in Missouri criminal trials. Even the fact that a defendant took, refused to take, or was willing to take

26

a polygraph is inadmissible." *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 49 (Mo. banc 2006) (internal citation omitted).

The State did not seek to admit the test results to demonstrate the truth of the matter asserted or to impeach Collings' credibility. Rather, the State sought to demonstrate Collings' understanding of the various waivers and consent forms he executed when agreeing to the tests to meet its burden of showing Collings' confession on November 9th was voluntary. Further, this evidence was presented during a suppression hearing, not during a criminal trial before a jury. This Court presumes the circuit court is able to disregard typically inadmissible evidence when offered for a different, admissible purpose.

The State also presented evidence of a sexual encounter Collings had with Rowan's older sister when she was eighteen years old. Collings revealed this encounter during law enforcement questioning on November 7th. The State argued this evidence was relevant to demonstrate Collings was willing to talk about topics adverse to his interests when speaking to law enforcement, which were indicia of the voluntariness of his later confessions.

The State concedes in its brief that this testimony "seems to have little relevance to the suppression issue." However, it is clear Collings sought to suppress every statement made during every encounter with all law enforcement officials throughout the duration of the investigation. At the suppression hearing, the State asserted that it felt it had to address the voluntariness of this statement because it could be relevant in rebuttal in the event Collings chose to testify during the penalty phase of the trial. The circuit court

27

only made passing reference to this incident in its judgment, and it is apparent it did not impact the circuit court's ruling. Accordingly, the circuit court did not abuse its discretion or make inconsistent rulings.

## Point III – Deliberation

Collings alleges the circuit court erred in overruling his motion for judgment of acquittal at the close of all of the evidence because he believes the State failed to prove beyond a reasonable doubt that he committed first degree murder. Specifically, Collings claims the evidence demonstrated that when he realized Rowan recognized him after he raped her, he "freaked out," grabbed a nylon cord or rope that was in the old pickup truck beside him, and immediately strangled her. Collings claims this evidence negated the element of deliberation to support a first-degree murder conviction and, at best, supported a conviction for second-degree murder.

This Court's review of the sufficiency of the evidence "is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of guilt beyond a reasonable doubt." *State v. Bateman*, 318 S.W.3d 681, 686-87 (Mo. banc 2010) (quoting *State v. Grim*, 854 S.W.2d 403, 419 (Mo. banc 1993)). In reviewing a challenge to the sufficiency of evidence, this Court must consider "the facts in evidence and all reasonable inferences that can be drawn therefrom" in the light most favorable to the verdict and must disregard "all contrary evidence and inferences." *State v. Andrews*, 329 S.W.3d 369, 378 (Mo. banc 2010) (quoting *State v. Goddard*, 649 S.W.2d 882, 884 (Mo. banc 1983)).

Section 565.020.1 defines first-degree murder as "knowingly causes the death of another person after deliberation upon the matter." Section 565.002(3) defines "deliberation" as "cool reflection for any length of time no matter how brief." The State is not required to prove the defendant contemplated his or her actions over a long period of time, only that the defendant had ample opportunity to terminate the attack once it began. *State v. Glass*, 136 S.W.3d 496, 514 (Mo. banc 2004). "Direct proof of a required mental state is seldom available, and the mental state may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying." *State v. Johns*, 34 S.W.3d 93, 110 (Mo. banc 2000).

Collings' actions before, during, and after Rowan's murder support a reasonable inference that he coolly reflected when causing her death. After deciding to return to Spears' home to get Rowan, Collings took the "quickest route" back and "knew if he hurried, he could beat [Spears and Mahurin] back to the house." Collings then went to Rowan's house, kidnapped her for sexual purposes, and returned to his trailer, which was secluded. All of these steps demonstrate planning on Collings' part to facilitate the crime, which is evidence of deliberation. *See State v. Kenley*, 952 S.W.2d 250, 265 (Mo. banc 1997) (finding plan to kidnap victim for sexual purposes and kill her to avoid identification was evidence of planning and deliberation).

Collings then took Rowan inside and raped her while she resisted. Collings took care not to speak so that Rowan would not recognize his voice and kept the lights off so she could not see his face. After Rowan turned around and recognized him, Collings indicated he "freaked out," grabbed the nylon cord or rope from the truck, and strangled

her until she quit moving, which took a few minutes. "Where a defendant commits a murder which, because of the particular method of attack, required some time to complete, this Court has permitted an inference of deliberation." *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997). *See also State v. Simmons*, 955 S.W.2d 729, 739 (Mo. banc 1997) (strangling that took four to five minutes to complete demonstrated deliberation). Moreover, murder to avoid identification also supports a finding of deliberation. *State v. Mease*, 842 S.W.2d 98, 111 (Mo. banc 1992).

Despite Collings' statements that he had no intention to rape or kill Rowan at the time he removed her from her home, and the only reason he strangled her was because he "freaked out" when she recognized him, the jury was free to disbelieve any of these self-serving statements. Moreover, this Court's standard of review requires it to disregard any contrary evidence that does not support the jury's verdict. The evidence presented amply supported the finding that Collings deliberated when he murdered Rowan, thus, supporting a first-degree murder conviction.

### Point IV – Admissibility of Physical Evidence

Collings argues the circuit court abused its discretion and plainly erred in overruling his objections and admitting several pieces of evidence during the trial. Generally, the circuit court is vested with broad discretion to admit or exclude evidence. *Tisius*, 362 S.W.3d at 398. Moreover, a defendant must demonstrate that an error was so prejudicial that he or she was deprived of a fair trial in order to be entitled to relief. *State v. Deck*, 303 S.W.3d 527, 538 (Mo. banc 2010).

*"String" from Burn Pile*

Collings claims the circuit court abused its discretion in admitting Exhibit 39A, an item collected from the burn pile that resembled a string or cord but later was determined to be strands of fiberglass. Collings argues the State misled the jury to believe that this "string" found on his property was the purported murder weapon when it was not. Collings further claims repeated referral to the item as a string or cord prejudiced him.

After Collings confessed to strangling Rowan with a cord retrieved from the bed of an old pickup truck, law enforcement officials seized what resembled a cord from a burn pile on Collings' property. In *State v. Griffin*, 756 S.W.2d 475, 483 (Mo. banc 1988), this Court explained evidence is relevant when it shows the condition of the crime scene and the nature of the police investigation, even if it does not link the defendant to the crime. The presence of a burnt string or cord at the crime scene was probative given Collings' statement that he used a rope or cord to strangle Rowan. Even if the evidence was irrelevant because it later was determined not to be the murder weapon, a defendant can hardly have been prejudiced by evidence showing no connection between himself and the crime. *Id*. Although Exhibit 39A was not the purported murder weapon, its admission was proper. Even assuming *arguendo* its admission was improper, Collings' suffered no prejudice.

*Ashes from Burn Stove*

Next, Collings challenges the admission of Exhibit 40, ashes from the wood stove. Collings argues the circuit court abused its discretion by admitting the ashes because the

State misled the jury to believe that the fact that the wood stove contained ashes was evidence of guilt when in actuality they had no probative value.

The ashes retrieved from the wood stove corroborated Collings' confession that he burned items in an attempt to destroy evidence. The ashes also showed the condition of the crime scene and the nature of the police investigation in that an officer testified that they collected everything that appeared to have evidentiary value at the crime scene. The circuit court did not abuse its discretion in admitting the ashes.

*Partial DNA Profile*

Collings argues testimony regarding the partial DNA profile developed from a hair found in the bed of Collings' truck was inadmissible because this testimony misled the jury to believe that the hair found in the truck bed was Rowan's. Collings did not preserve this issue for appeal; therefore, this Court will review his allegation for plain error only.

Collings concedes partial DNA profiles generally are admissible to show the defendant was not excluded as a possible source of the DNA at issue. However, any argument concerning the manner in which the DNA testing is conducted and the results reached goes more to the credibility of the witness and the weight of the evidence and not to the evidence's admissibility. *State v. Ferguson*, 20 S.W.3d 485, 495 (Mo. banc 2000). Further, during his videotaped confessions, Collings admitted he put Rowan's body into the bed of his truck after he strangled her. The circuit court did not commit plain error in admitting this testimony.

*Hair Comparisons*

Finally, Collings claims the testimony and evidence regarding the comparison of pubic region hairs found on Rowan's body with Collings' pubic hair was inadmissible. Collings contends this evidence misled the jury to believe that the pubic region hairs belonged to him, when, in fact the comparison was so flawed that it had no probative value. Just as with the partial DNA profile, any argument concerning the pubic region hairs goes to the weight, not the admissibility, of the evidence. *Id.* Moreover, Collings was adamant that he was alone with Rowan, and he was the only individual who had sexual intercourse with her prior to the murder. In light of the overwhelming evidence of guilt, the circuit court did not abuse its discretion in admitting this testimony.

## Point V – Admissibility of Photographs

Collings claims the circuit court abused its discretion in admitting several photographs depicting Rowan's body as it was found in the sinkhole and her autopsy photographs. Collings argues these photographs were cumulative, excessively gruesome, and prejudicial in violation of his right to a fair trial.

A circuit court retains broad discretion in the admission of photographs, and its decision will not be overturned absent an abuse of discretion. *State v. Dorsey*, 318 S.W.3d 648, 657 (Mo. banc 2010). "Photographs are relevant if they depict the crime scene, the victim's identity, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony." *State v. Rousan*, 961 S.W.2d 831, 844 (Mo. banc 1998).

*Crime Scene Photographs*

The circuit court entertained extensive argument outside the hearing of the jury about the relevance and potential prejudicial effect of the crime scene photographs. The circuit court explained its ruling as to each individual photograph, prior to admission, and expressed concern about photographs it deemed duplicative, which were excluded. The FBI photographer testified extensively regarding the photographs taken at the sinkhole where Rowan's body was recovered. These crime scene photographs, which were taken from different angles and viewpoints, depicted relevant facts, including: Rowan's appearance in the sinkhole; the nature and extent of her injuries resulting from the rape; the ligature marks from the strangulation; and the condition of her body, including her partial state of undress and the debris found on and around her body. The photographs further demonstrated how Rowan's body was examined in the sinkhole and handled after removal. Thus, the circuit court did not abuse its discretion in admitting the crime scene photographs.

*Autopsy Photographs*

Collings claims the autopsy photographs were likewise duplicative, excessively prejudicial, and lacking in probative value. Collings further argues the photographs were gruesome, particularly the close up of Rowan's vaginal area, and were not relevant to the murder charge. "Generally, gruesome photographs are relevant and admissible if they: (1) show the nature and location of wounds; (2) enable jurors to better understand the testimony at trial; and (3) aid in establishing an element of the state's case." *Rousan*, 961

S.W.2d at 844.  A relevant photograph should not be excluded on the grounds that the crime itself was gruesome.  *State v. Johnson*, 244 S.W.3d 144, 161 (Mo. banc 2008).

The parties presented extensive argument to the circuit court, outside the hearing of the jury, regarding the admissibility of the autopsy photographs.  The State went so far as to present the circuit court with all of its photographs so that it could compare which ones were excluded in contrast to those being offered.  The photographs, while gruesome, aided the pathologist in explaining the autopsy findings.  The photographs also showed the nature and location of Rowan's wounds.  Finally, the photographs aided the State in establishing Collings' motive for murdering Rowan, specifically that he was concerned she would identify him as her rapist.  The circuit court did not abuse its discretion in admitting these photographs.

### Point VI – Closing Argument

Collings raises two claims of error regarding the State's guilt phase and penalty closing argument.  The circuit court has broad discretion in controlling the scope of closing argument.  *State v. Banks*, 215 S.W.3d 118, 122 (Mo. banc 2007).  This Court will reverse a ruling on closing argument only upon a showing of abuse of discretion resulting in prejudice to the defendant.  *Id*.

*Guilt Phase – Improper Personalization*

Collings argues the circuit court abused its discretion in overruling his objections and request for a mistrial during the guilt phase closing argument when the prosecutor stood mute for thirty seconds while holding his hands as if he were strangling someone.  After the circuit court admonished the prosecutor to not proceed further with such a

35

display, Collings claims the prosecutor repeated the same conduct. Collings argues this resulted in improper personalization and prosecutorial misconduct because he attempted to place the jurors in the same position as Rowan as she was being strangled. Collings claims this display induced the jurors to base their deliberations on fear and anger rather than dispassionate reasoning.

"Jurors cannot be asked to place themselves in the shoes of the victims." *State v. Baumruk*, 85 S.W.3d 644, 650 (Mo. banc 2002). Arguing for jurors to supplant themselves in the position of a party or a victim is improper personalization that can only arouse fear in the jury. *State v. Hall*, 16 S.W.3d 582, 585 (mo. banc 2000). Such arguments standing alone do "not always constitute reversible error, particularly where the trial court has taken effective action" to correct them. *State v. Rhodes*, 988 S.W.2d 521, 528-29 (Mo. banc 1999).

The prosecutor discussed how Collings strangled Rowan and made a gesture with his hands to demonstrate how the strangling was described by several witnesses during trial. Defense counsel objected as to improper personalization. The prosecutor argued he was rebutting the argument that Collings did not reflect coolly upon Rowan's murder. The circuit court directed the prosecutor "not to go any further with this," but recognized other witnesses had indicated the same gesture in demonstrating Rowan's strangulation. When the prosecutor resumed his argument, he continued to hold his hands in the same manner, to which defense counsel objected again. The circuit court stated, "[W]e probably need to stop," but stated the prosecutor was demonstrating what was shown in the evidence and overruled defense counsel's objection.

36

Collings relies on *Rhodes* to support his argument that this improper personalization constituted reversible error. In *Rhodes*, this Court determined that when a prosecutor physically demonstrated the crime and asked the jurors to place themselves repeatedly in the victim's shoes and imagine how the victim suffered through her last breath, it constituted improper personalization and required a new penalty phase. *Rhodes*, 988 S.W.2d at 529. *Rhodes* is distinguishable from the case at bar because the prosecutor did not make any statements about the jurors placing themselves in Rowan's shoes or to imagine what she went through when she was raped and murdered. Rather, the prosecutor held his hands in the same fashion several witnesses described as what Collings depicted during the murder. The prosecutor was entitled to rebut Collings' argument that he did not reflect coolly upon Rowan's murder with a demonstration of how long it took to strangle Rowan. *See Glass v. State*, 227 S.W.3d 463, 474 (Mo. banc 2007) (holding prosecutor entitled to demonstrate that thirty seconds was sufficient period of time to deliberate about killing another person by instructing the jury to "watch the clock."). The circuit court did not abuse its discretion in overruling Collings' objections and request for a mistrial on this issue.

*Penalty Phase – Disparaging Defense Counsel and*
*Precluding Mitigating Circumstances Evidence*

Collings argues the circuit court plainly erred in failing, *sua sponte*, to bar the prosecutor from stating that his evidence regarding Spears' possible involvement in Rowan's murder was intended to distract and confuse jurors and should not be considered. During the penalty phase, the prosecutor stated:

Now, when it comes to … Spears, folks, he's not on trial here today. He never has been during any part of this trial …. It's just something to distract you with. Distract and confuse. Distract and confuse. Try to get some -- some little thing burrowed down deep, something to distract and confuse you. Don't let it happen …. Spears is not on trial and has nothing to do with this [Collings'] punishment.

Collings asserts this argument disparaged defense counsel and effectively instructed the jury to disregard mitigating circumstance evidence in Collings' favor. "Comments directed at the tactics of defense counsel are permissible." *Tisius v. State*, 183 S.W.3d 207, 218 (Mo. banc 2006). It is clear the prosecutor's comments were directed at the tactic employed by defense counsel to "distract and confuse" the jury, rather than a personal attack. Further, the prosecutor's comments did not instruct the jury it could not consider the evidence of Spears' potential involvement in Rowan's murder but rather, attacked the relevance and credibility of the defense's theory, which is permissible. *See State v. Clemons*, 946 S.W.2d 206, 229 (Mo. banc 1997) (holding prosecutor's argument that defense's theory was "preposterous" and "pretty stupid" was proper argument).

The circuit court did not plainly err in failing, *sua sponte* to intercede to prevent the prosecutor's argument regarding Collings' evidence concerning Spears' potential involvement in Rowan's murder. These comments did not disparage defense counsel, and they did not prevent the jury from considering mitigating circumstance evidence in Collings' favor.

## Point VII – Father Testimony Regarding Death Penalty

Collings contends the circuit court erred in overruling his objection and request for a mistrial in allowing the jury to consider, as evidence that he should be executed, that his own father believed in the death penalty. Collings argues the prosecutor committed deliberate misconduct by violating a pretrial ruling to discuss potentially inadmissible evidence at the bench and by eliciting opinion testimony about the appropriateness of a death sentence. Collings denies that defense counsel opened the door to this impermissible and highly prejudicial testimony. Collings requests a new penalty phase hearing.

The circuit court is vested with broad discretion to admit or exclude evidence during a criminal trial. *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998). This Court will reverse the circuit court's decision only if that discretion was clearly abused. *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997).

Collings' biological father, Dale Pickett (hereinafter, "Pickett"), testified on Collings' behalf during the penalty phase of the trial. Pickett testified about his tumultuous relationship with Collings' biological mother, his alcoholism, his criminal past, Collings' time in foster care, and his attempt to reunite with Collings after Pickett was released from prison. Pickett testified, "I know that my son made a serious mistake. Mistakes is [sic] something that everybody makes. Regardless of what happens, I still love my son and everything and I'll still be there for him. But I know a man can change. Anybody can change. I have …." During cross-examination, the prosecutor asked Pickett if he believed in the death sentence, to which he responded, "No, I do not." The

prosecutor then asked, "When your brother was murdered … you wanted the death penalty to be given." Defense counsel objected, but Pickett answered, "I wanted to be the one to kill him."

Counsel had a bench conference wherein defense counsel argued the prosecutor's question was improper and inflammatory and requested a mistrial. The prosecutor argued defense counsel opened the door to the question when he asked Pickett about Collings' mistakes. Defense counsel disagreed and argued that asking a witness' opinion about the appropriate sentence was irrelevant and invaded the province of the jury. The circuit court overruled defense counsel's objection and request for a mistrial. The prosecutor indicated she would not re-ask the question and did not repeat the question when she resumed the examination.

Admission of a victim's family members' characterizations and opinions about the appropriate sentence are inadmissible. *State v. Taylor*, 944 S.W.2d 925, 938 (Mo. banc 1997). This bar applies equally to family members of the defendant. *State v. Roll*, 942 S.W.2d 370, 378 (Mo. banc 1997).

Here, the isolated question posed by the prosecutor did not seek to elicit an opinion from Pickett about what would be an appropriate sentence for Collings. Even if one could construe the question and response in such a way, Collings failed to demonstrate prejudice occurred. Pickett was one of several defense penalty phase witnesses. Pickett's answer was isolated, not emphasized or repeated, and was not mentioned during either party's closing argument. Accordingly, Collings has failed to

demonstrate to a reasonable probability that this comment, if erroneously admitted, affected the outcome of the penalty phase of the trial.

### Point VIII – Instructional Error

Collings claims the circuit court erred in tendering Instruction No. 17, patterned after MAI-CR3d 314.44, which he contends relieved the State of its burden of proof by requiring Collings to establish eligibility for a life sentence by proving that mitigating circumstances outweigh aggravating circumstances. Instead, Collings believes the jury should have been instructed that the State must prove that aggravating circumstances outweigh mitigating circumstances or that mitigating circumstances weigh less than aggravating circumstances.

This Court will reverse the circuit court's decision to submit an instruction only if the instructional error misled the jury and is so prejudicial that it deprives the defendant of a fair trial. *Tisius*, 362 S.W.3d at 412. MAI instructions are presumed to be valid and, when applicable, must be given. *Johnson*, 207 S.W.3d at 46-47; Rule 28.02(c).

Collings' allegations that the instructions improperly shifted the burden of proof have been rejected by the United States Supreme Court and this Court. The United States Supreme Court stated:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

41

*Kansas v. Marsh*, 548 U.S. 163, 170-71 (2006) (quoting *Walton v. Arizona*, 497 U.S. 639, 650 (1990) (*overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002)). Moreover, this Court has rejected similar challenges to the jury instructions patterned after MAI-CR3d 314.44 in *Deck*, 303 S.W.3d at 548, *Johnson*, 284 S.W.3d at 589, and *State v. Forest*, 183 S.W.3d 218, 228-29 (Mo. banc 2006). Collings has not offered a meritorious reason why this Court should reconsider the holdings in these cases.

### Point IX – Sufficiency of Pleading Aggravating Circumstances

Collings next avers the circuit court erred in sentencing him to death for a crime never pleaded in the information, thereby violating a number of his constitutional rights. Collings argues the State never charged him with "aggravated first degree murder," which is the only offense punishable by death in Missouri. Collings claims the State's information failed to plead those facts the jury had to find beyond a reasonable doubt before he could be sentenced to death.

This identical claim has been rejected by this Court in *Deck*, 303 S.W.3d at 549-550, *Johnson*, 284 S.W.3d at 589, *Baumruk*, 280 S.W.3d at 617-18, and *State v. Zink*, 181 S.W.3d 66, 74-75 (Mo. banc 2005). Collings has not set forth a meritorious reason why this Court should reconsider the holdings in these cases.

### Point X – Proportionality Review

Finally, Collings argues this Court's independent duty to conduct a proportionality review requires this Court to vacate his death sentence and impose a sentence of life imprisonment without parole. When reviewing the imposition of a death sentence, section 565.035.3 requires this Court to undertake a proportionality review to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

The proportionality review mandated by section 565.035.3 requires consideration of all factually similar cases in which the death penalty was submitted to the jury, including those resulting in a sentence of life imprisonment without the possibility of probation or parole. *State v. McFadden*, 391 S.W.3d 408, 428 (Mo. banc 2013) (citing *Deck*, 303 S.W.3d at 555-63 (J. Stith concurring), and *Anderson*, 306 S.W.3d at 544 (J. Breckenridge concurring)).

First, this Court must examine whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Collings argues the death sentence was obtained by the State's exploitation of the jury's emotions by emphasizing Rowan's rape and young age. Collings' argument simply repeats his allegations of error regarding the admission of the photographs, the prosecutor's demonstration of strangling during the guilt phase closing argument, and the admission of Pickett's testimony about his reaction to his brother's death.

Second, this Court must determine whether the evidence supports the statutory aggravating circumstance findings by the jury. The jury determined Rowan's murder was outrageously and wantonly vile, horrible, and inhumane because it involved torture. The jury also found Rowan was murdered as a result of her status as a potential witness against Collings for the rape. Collings fails to refute or challenge any of the statutory

43

aggravating circumstances found as unsupported by the evidence, but instead, discusses the circumstances surrounding his tumultuous upbringing, his history as a sexual assault victim, and his substance abuse issues. These mitigating circumstance factors do nothing to negate the sufficiency of the statutory aggravating circumstance factors found by the jury.

Finally, this Court must consider whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. Collings does not address the crime, which was horrific and painful for Rowan, or the strength of the evidence, which was bolstered by Collings' full, repeated confessions. Rather, Collings sets forth all of the favorable mitigating circumstance evidence that supports imposing a lesser sentence, including his confession accepting full responsibility and his remorsefulness. Collings only accepted full responsibility for the murder after he disposed of Rowan's body, destroyed incriminating evidence, and spent a week lying and misdirecting law enforcement's efforts to locate Rowan. This Court has upheld death sentences imposed even after a defendant eventually confesses to the crime. *See Deck*, 303 S.W.3d at 553 (holding proportionality review warranted death sentence despite defendant's confession after hiding evidence and providing false alibis to law enforcement).

Collings also points out the bizarre circumstances surrounding Spears' potential involvement in the murder. Collings steadfastly maintained Spears had no involvement in Rowan's murder, and therefore, Spears' self-proclaimed involvement does nothing to diminish Collings' actions. Collings points to the fact that he was intoxicated and

impaired by marijuana at the time to argue the death sentence was excessive. However, this impairment did not prevent Collings from deliberating with respect to the planning, execution, and cover up of Rowan's rape and murder.

Collings finally argues the death sentence imposed is disproportionate to the sentences imposed in similar cases. Collings cites *Greathouse v. State*, 83 S.W.3d 554 (Mo. App. W.D. 2002), *State v. Davis*, 963 S.W.2d 317 (Mo. App. W.D. 1997), *State v. Brandon*, 17 S.W.3d 565 (Mo. App. E.D. 2000), *State v. Johnson*, 328 S.W.3d 385 (Mo. App. E.D. 2010), and *State v. Little*, 861 S.W.2d 729 (Mo. App. E.D. 1993), as cases in which the defendants received life sentences after sexually assaulting and murdering their victims. Of these five cases, only two, *Greathouse* and *Davis*, involve the sexual assault and murder of teenaged victims, and it is not apparent why the defendants in those cases were given life sentences.

Collings' case is remarkably similar to *Johnson*, 207 S.W.3d 24 (Mo. banc 2006), which this Court summarized as follows:

> This case involves the heinous killing of a small child. Johnson admitted that he kidnapped six-year old Casey Williamson and took her to a pit in an abandoned factory. He admitted that he attempted to rape her, struck her head repeatedly with a brick, and dropped a boulder on her head. He admitted that after she stopped breathing he covered her body with rocks and debris and then went to the river to wash away the evidence of his crimes.

*Id*. at 51. This Court determined the death sentence in that case was neither excessive nor disproportionate compared to the penalty imposed in similar cases. *Id*.

Collings' death sentence is consistent with the punishment imposed in other cases in which the defendant abducted a young victim and then sexually abused and murdered

45

the victim. *See*, *e.g.*, *Glass*, 136 S.W.3d at 521; *Ferguson*, 20 S.W.3d at 511; *State v. Brooks*, 960 S.W.2d 479, 502 (Mo. banc 1997). This Court has affirmed sentences of death when the jury finds the defendants acted with a depraved mind in strangling or smothering the victim to death after raping or sodomizing or attempting to rape or sodomize the victim. *State v. Davis*, 318 S.W.3d 618, 645 (Mo. banc 2010); *State v. Brown*, 902 S.W.2d 278, 283 (Mo. banc 1995); *State v. Mercer*, 618 S.W.2d 1, 3-4 (Mo. banc 1981). Moreover, the death penalty has been imposed in many cases in which the defendant has murdered a victim in the course of, or just after, raping that victim. *See*, *e.g.*, *Davis*, *supra*; *State v. McLaughlin*, 265 S.W.3d 257, 260 (Mo. banc 2008); *State v. Kinder*, 942 S.W.2d 313, 320 (Mo. banc 1996); *State v. Gray*, 887 S.W.2d 369, 375 (Mo. banc 1994). None of these cases compel a finding that Collings' death sentence is disproportionate.

## Conclusion

For the foregoing reasons, the circuit court's judgment is affirmed.

_____
GEORGE W. DRAPER III, JUDGE

Russell, C.J., Breckenridge, Stith, Wilson
and Teitelman, JJ., concur; Fischer, J.,
concurs in separate opinion filed.

46



# SUPREME COURT OF MISSOURI
## en banc

|  |  |  |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC92720 |
| | ) | |
| CHRISTOPHER L. COLLINGS, | ) | |
| | ) | |
| Appellant. | ) | |

## CONCURRING OPINION

I concur in the principal opinion's affirmance of Collings' conviction and sentence. However, several of Collings' claims are not preserved for this Court's review, and I would not review those claims for plain error. The principal opinion leaps into an analysis of the merits of Collings' unpreserved claims without any analysis concerning whether this Court should exercise its discretion to review for plain error. Further, the principal opinion addresses the merits of the claims requesting plain error review as though they were preserved. In my view, the Court should not exercise its discretion to review Collings' unpreserved claims for plain error because none of the alleged errors are evident, obvious, and clear.

**Plain Error Review Generally**

Claims of error for which the appellant did not object at trial or did not present to the circuit court in a motion for new trial are not preserved for appellate review. *State v. Carter*, 415 S.W.3d 685, 691 (Mo. banc 2013) (no objection); *State v. Cella*, 32 S.W.3d 114, 117 (Mo. banc 2000) (not in the motion for new trial). An appellant is not entitled to review of unpreserved claims, and generally, this Court will not review them. *E.g.*, *Cella*, 32 S.W.3d at 117; *State v. Davis*, 348 S.W.3d 768, 770 (Mo. banc 2011). The exception is for "plain errors affecting substantial rights," which "may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20.

"The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Jones*, 427 S.W.3d 191, 195 (Mo. banc 2014) (internal quotation marks omitted). The Court will not review for plain error unless the appellant has requested it. *Davis*, 348 S.W.3d at 770 & n.4. When plain error review is requested, the Court then must determine, before engaging in plain error review, whether the alleged error is, on its face, of the type covered by Rule 30.20. An alleged error is considered "plain" if it would result in manifest injustice or miscarriage of justice that is so "evident, obvious, and clear" that the circuit court should have recognized and corrected the error on its own,

without objection or motion.[1] *Jones*, 427 S.W.3d at 195. "Unless the appellant makes this facial showing, this Court will decline to review for plain error under Rule 30.20." *Id.* at 195-96.

To be entitled to relief under the plain error rule, the appellant must "'go beyond a mere showing of demonstrable prejudice'" to show manifest injustice affecting his or her substantial rights. *State v. Parker*, 856 S.W.2d 331, 332 (Mo. banc 1993). In other words, the appellant must show that the error affected his or her rights so substantially that a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* at 333. Even though an appellate court may refuse to entertain plain error review, it later can consider claims of ineffective assistance of counsel for failure to preserve the alleged trial error. *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997).

## Collings' Requests for Plain Error Review of Certain Actions, None of Which Qualifies for Plain Error Review

The three claims for which Collings requests plain error review are as follows: First, that the circuit court plainly erred in excluding evidence offered by Collings at the hearing to determine whether to suppress Collings' confession, yet admitting evidence offered by the State, because the circuit court (1) should have considered evidence of a videotaped conversation between Chief Clark and Collings after Collings was arraigned, which allegedly shows that the relationship between Chief Clark and Collings was coercive and that Collings' prior confession was involuntary; (2) should have considered

---

[1] Of course, the circuit court itself has discretion pursuant to Rule 29.12(b) if it determines during any time that it still has jurisdiction that it has erred in a manner that would cause manifest injustice or a miscarriage of justice.

3

evidence that the police employed another "false friend" in interrogating Spears; (3) should not have considered the State's evidence that Collings took a lie detector test and a voice stress analysis test; and (4) should not have considered the State's evidence that Collings had a consensual sexual encounter with the victim's 18-year-old sister. Collings' second claim for which he requests plain error review is that the circuit court plainly erred in admitting evidence of a partial DNA profile from a hair found in Collings' truck because the jury was misled into believing the hair belonged to the victim. The third claim is that the circuit court plainly erred in not preventing the prosecutor, on the court's own motion, from arguing during the penalty-phase closing argument that defense counsel's reference to David Spears was intended to "distract and confuse" the jurors because the argument disparaged defense counsel and suggested that the jury could not consider evidence regarding Spears as mitigating evidence. Collings either did not object at trial or did not include these claims in his motion for new trial; therefore, they are not preserved. *See Carter*, 415 S.W.3d at 691; *Cella*, 32 S.W.3d at 117.

The circuit court has broad discretion whether to admit evidence for the jury's consideration at trial and should have even broader discretion at a hearing for the judge's own consideration on the issue of whether evidence is admissible at trial. *See, e.g.*, *State v. Shockley*, 410 S.W.3d 179, 195 (Mo. banc 2013). In addition, claims that the prosecutor made improper statements during closing argument rarely result in manifest injustice. *Carter*, 415 S.W.3d at 691. This Court often has declined plain error review of claims regarding the admissibility of evidence and claims of improper argument by the prosecutor. *See Jones*, 427 S.W.3d at 196 n.5 (collecting cases).

4

**Conclusion**

Because Collings has not raised any error that would be so "evident, obvious, and clear" that the circuit court should have identified and corrected the error on its own motion, I would not engage in plain error review. *See id.* at 195. I concur in the affirmance of Collings' conviction and sentence but do not join the principal opinion's plain error analysis.

_____
Zel M. Fischer, Judge