Mary R. Russell, Judge
Christopher Collings was convicted of first-degree murder and sentenced to death following a jury trial. This Court affirmed the judgment and sentence on direct appeal in State v. Collings , 450 S.W.3d 741 (Mo. banc 2014). Collings timely filed a pro se motion to vacate, set aside, or correct the judgment and sentence. Counsel was appointed and timely filed an amended motion under Rule 29.15, raising 12 claims of ineffective assistance of trial counsel, two claims of ineffective assistance of appellate counsel, and claims challenging the constitutional validity of section 562.076[1] regarding voluntary intoxication and the time limits. At an evidentiary hearing, Collings's trial and appellate counsel, two expert witnesses, and five other witnesses testified. The motion court overruled the motion, denying relief on all claims. Collings appeals.
This Court holds the motion court's findings of fact and conclusions of law are not clearly erroneous and the motion court's judgment was not plainly erroneous regarding an unpreserved claim of error. The motion court's judgment denying postconviction relief is affirmed.
Factual and Procedural Background
Nine-year-old Rowan Ford lived with her mother and stepfather, David Spears. For several months in early 2007, Christopher Collings lived with the Spears family but had since moved out.
On November 2, 2007, Spears, Collings, and their friend Nathan Mahurin were drinking alcohol and smoking marijuana together at Spears's house. Later in the evening, the three men went to Collings's trailer and left Ford home alone. On the way, the men stopped at a convenience store and bought more alcohol. They continued drinking and smoking at Collings's trailer for about an hour, at which time Mahurin and Spears left. Wanting to avoid police, an intoxicated Mahurin decided to use the back roads to take Spears back to his home before returning to his own home by midnight.
The next morning, Ford's mother returned from her overnight work shift and could not find her. After Ford's mother contacted the local sheriff's department and reported her missing, a large-scale search effort was launched to locate Ford.
Deputies informally spoke to Collings about Ford's disappearance, and he recounted the events of the evening of November 2. Collings stated he was unaware of Ford's disappearance until speaking with the police and had not spoken to Spears since that night. Collings was interviewed several more times by local deputies and the FBI over the course of the next few days.
Ford's body was found November 9 in a cave. She was nude from the waist down except for one sock and was covered in leaves and debris. The cause of death was later determined to be strangulation as indicated by the ligature mark on her *6 neck. She had also been sexually assaulted and suffered injuries to her vaginal area.
Once news broke that Ford's body had been located, Collings attempted to contact Wheaton Chief of Police Clinton Clark, whom Collings had known since he was a young boy, and the two men agreed to meet.
Collings told Chief Clark what happened the evening of November 2 after Mahurin and Spears left his trailer. Collings recounted the same version of events until Mahurin and Spears left around 11:30 p.m. Collings said he knew Mahurin would drive the back roads to avoid potentially being pulled over by police because he was intoxicated. Collings further noted he took the highway, knowing he would arrive at Spears's home before the others. When Collings arrived at Spears's home, he walked through the house, used the bathroom, and then went into Ford's bedroom. He found her sleeping on the floor in her bedroom and carried her to his pickup truck. Collings drove them back to his trailer, and Ford did not wake during the drive. Once they arrived, Collings carried her inside, laid her on the bed, took off her pants and underwear, "used his finger on her a little," and then had sexual intercourse with her for four to five minutes, possibly ejaculating. Ford awoke when he penetrated her, and she struggled.
Collings told Chief Clark he intended to return Ford to her home. After sexually assaulting Ford, he led her outside facing away from him and kept the lights off so she could not see his face. Collings also ensured he did not speak so Ford could not recognize his voice. On the way back to the truck, however, moonlight allowed Ford to see Collings's face. Knowing she had recognized him, he "freaked out." Collings saw a coil of cord in the bed of his truck, looped it around Ford's neck, and started pulling. She fell to the ground after struggling for a bit, and he held the cord tight until she stopped moving.
Collings put Ford's body in the bed of his truck and drove off without covering her body. He decided to put her body in a sinkhole inside a cave. Once he returned home, he burned Ford's pants and underwear and the cord he used to strangle her in a wood stove and burn barrel. Collings also burned his clothes and the mattress on which he sexually assaulted her after finding blood on them.
Chief Clark and Collings returned to the sheriff's department so Collings could recount his story to the other local and federal law enforcement officials working on the investigation. This confession was not recorded, and Collings signed a consent form to search his property. He was taken to the Barry County Sheriff's Department and, after being advised of his rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), provided a recorded statement retelling the same events.
Law enforcement officers were surprised by Collings's confession because, until then, they had assumed Spears killed Ford and Collings simply knew what happened. Local deputies questioned Spears again in light of Collings's confession. For the first time, however, Spears implicated himself. As a result, deputies and Chief Clark questioned Collings again in a recorded interview. They told him Spears confessed to calling his mother the evening of November 2, asking her to bring a vehicle to his house, and then joining Collings back at his trailer. Spears stated he also had sexual intercourse with Ford, was present when Collings killed her,[2] and *7 helped dispose of her body. Collings, however, denied Spears was involved.
While Collings gave the second recorded statement, his trailer and adjacent property were searched and authorities obtained evidence supporting Collings's confession. The evidence collected included rope and wire inside Collings's truck, a 55-gallon drum containing remnants of burned items, and a hair in the bed of his truck.
Collings was charged with one count of first-degree murder. He was also initially charged with one count of forcible rape and one count of statutory rape. The rape charges were later severed from the murder charge, and both rape charges were eventually dismissed. At the end of the guilt phase, the jury found Collings guilty of first-degree murder.
Both the State and Collings's trial counsel presented testimony evidence during the penalty phase. The State offered victim impact testimony from members of Ford's family, friends, and teachers who testified about the impact Ford's life and death had on them. Collings's trial counsel called two witnesses to support the defense theory of lingering doubt regarding Spears's involvement. Spears's mother also testified in support of the defense theory of lingering doubt concerning her son's role the evening of November 2. According to Spears's mother, her son called around midnight, asked her to drive to his home, left in her Suburban while she stayed at his house, and then returned by 7 a.m. A search and rescue dog handler testified two dogs trained to alert at the scent of human remains separately alerted on the Suburban's driver's side door, left rear quadrant, driver's seat, and rear cargo area. In addition, Collings's trial counsel called his biological father, brother, and two adoptive siblings to testify about his childhood.
Finally, Collings's trial counsel called Dr. Wanda Draper, an educator in the field of human development, as an expert to testify about the phases in Collings's childhood. Her testimony focused on Collings's emotional development. Dr. Draper created a "Life Path" detailing severe emotional neglect during his first six months of life and confusion in his connections with his biological and adoptive family members.[3] Dr. Draper concluded, to a reasonable degree of developmental certainty, Collings suffered severe emotional neglect resulting in severe disorganized dissociative attachment.
Dr. Draper further explained Collings's history concerning sexual abuse. He was sexually molested when he was six years old by his babysitter's 13-year-old son. Collings was also sodomized when he was 15 years old by his biological mother's new husband. Dr. Draper also stated Collings admitted to fondling his stepsister when she was 11, 14, and 16 years old, which Dr. Draper testified was consistent with Collings being sexually abused himself. Despite her testimony concerning Collings's history with sexual abuse, Dr. Draper did not explain any causal connection between his sexual abuse and any possible neurobiological impacts on Collings's brain development.
At the conclusion of the penalty phase, the jury recommended death. It found Ford's murder involved torture and, pursuant to section 565.032.2(7), the murder was "outrageously or wantonly vile, horrible or inhuman." Additionally, the jury *8 found Ford was a potential witness against Collings in a pending investigation of her rape and was killed as a result of her status. See sec. 565.032.2(12). The trial court sentenced Collings to death, and this Court affirmed the judgment and sentence on direct appeal. Collings , 450 S.W.3d 741.
Collings timely filed pro se and amended motions seeking postconviction relief pursuant to Rule 29.15, raising 12 claims of ineffectiveness of both his trial and appellate counsel. After an evidentiary hearing, the motion court denied relief on all claims. Collings now appeals to this Court.[4]
Standard of Review
This Court will affirm a motion court's judgment denying postconviction relief unless its "findings and conclusions are clearly erroneous." Rule 29.15(k); Johnson v. State , 406 S.W.3d 892, 898 (Mo. banc 2013). A motion court's findings are presumed correct, and its judgment is clearly erroneous "only if this Court is left with a definite and firm impression that a mistake has been made." Id.
To prevail on a claim for ineffective assistance of counsel, a postconviction movant must prove by a preponderance of the evidence that counsel's performance failed to meet the test in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland , a movant must establish (1) counsel failed to exercise the degree of skill and diligence that a reasonably competent attorney would in a similar situation and (2) the movant was prejudiced. Id. at 687, 104 S.Ct. 2052 ; Johnson , 406 S.W.3d at 898-99. In a case in which the sentence imposed is death, prejudice is shown if the movant demonstrates "a reasonable probability that, but for counsel's deficient performance, the jury would have concluded the balance of aggravating and mitigating circumstances did not warrant death." Johnson , 406 S.W.3d at 899.
Analysis
I. Constitutional Challenge to Voluntary Intoxication Statute and Jury Instruction
In his first point on appeal, Collings argues section 562.076 and its corresponding jury instruction violate his right to present a defense. Section 562.076.1 provides, "A person who is in an intoxicated or drugged condition, whether from alcohol, drugs or other substance, is criminally responsible for conduct unless such condition is involuntarily produced and deprived him of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct."
The State offered the following jury instruction based on MAI-CR 3d 310.50: "The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated or a drugged condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct." Trial counsel objected to MAI-CR 3d 310.50 as limiting the defense but presented no evidence concerning Collings's alleged alcohol addiction or its effects on his mental capacity.
According to Collings, this statute and jury instruction denied him due process by preventing him from presenting evidence rebutting the State's evidence of his ability to deliberate before killing Ford. A person is guilty of first-degree murder if he or she "knowingly causes the death of another person after deliberation upon the matter."
*9 Sec. 565.020.1. "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Sec. 565.002(3).
Collings contends his trial counsel were constitutionally deficient in failing to investigate and present evidence challenging the constitutional validity of section 562.076 and its corresponding jury instruction. He argues his trial counsel failed to offer modern scientific research on drug and alcohol addiction and their effects on brain behavior, which supports consideration of the fairness and constitutional validity of statutes restricting evidence of voluntary intoxication.
"When a movant claims ineffective assistance of counsel for failure to locate and present expert witnesses, he must show that such experts existed at the time of trial, that they could have been located through reasonable investigation, and that the testimony of these witnesses would have benefited movant's defense." State v. Davis , 814 S.W.2d 593, 603-04 (Mo. banc 1991). Collings's postconviction counsel presented testimony from Dr. Melissa Piasecki, a board-certified forensic psychiatrist whose specialty was addiction neurobiology. Dr. Piasecki testified at the evidentiary hearing that, at the time of Collings's trial, well-accepted scientific research recognized addiction as a brain disease. According to Dr. Piasecki, long-term chemical exposure to addictive substances, such as alcohol, causes physical changes to the brain's structure and functioning.[5] These changes impact compulsive behavior and affect the addict's decision making, inhibition, planning, and impulse control.[6]
Dr. Piasecki further testified about the genetic component to substance abuse, stating 50 percent of addiction is traceable to genetic factors and 50 percent is traceable to environmental factors. She listed the following as factors contributing to substance addiction: having a biological relative with an addiction disorder; childhood trauma or abuse; loss of parental figures; domestic violence; and family members with substance abuse and mental health disorders.
Collings's postconviction counsel retained Dr. Piasecki to determine whether he had a history of substance abuse and addiction. Because both of his biological parents suffered serious problems with alcohol and drug addiction, Dr. Piasecki concluded Collings was genetically predisposed to addiction. Dr. Piasecki further testified Collings was first exposed to nicotine at a very young age and began using alcohol and marijuana when he was 14 years old. At 15 years old, Collings spent several weeks in an inpatient facility for adolescents with psychiatric problems. While there, he was prescribed a number of medications, including antidepressants and a sedative. Despite recommendations from the doctors that Collings continue receiving ongoing psychotherapy and an antidepressant, his family did not refill his prescription, and he continued smoking marijuana as a way to self-medicate his anxiety.
Turning to the night of Ford's murder, Dr. Piasecki testified Collings would have been under "acute significant alcohol intoxication" after imbibing six six-packs of Smirnoff Ice Triple Black over the course *10 of six hours with no food after lunch. That level of intoxication, according to Dr. Piasecki, would have resulted in aggressive brain functioning impairments, decreased inhibition, impaired comprehension, and a significantly compromised ability to pause and consider actions. She further testified people under acute significant alcohol intoxication further can lose their ability to record memories despite maintaining consciousness. Dr. Piasecki concluded Collings could have suffered such "blackouts" due to the amount of alcohol he consumed the night of November 2.
At the evidentiary hearing, Dr. Piasecki concluded, in her expert opinion, the jury could not accurately assess Collings's mental state at the time of the murder without considering his history of alcohol and drug use. According to her, his level of intoxication at the time would have substantially impaired his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. She further stated she would have provided the same testimony at trial had she been contacted.
Collings argues he was prejudiced because evidence of his drug and alcohol use the night of Ford's murder and his history of drug and alcohol addiction would have created reasonable doubt about his mental state, i.e., his ability to deliberate before killing Ford. Accordingly, Collings contends there is a reasonable probability he would not have been convicted of first-degree murder or sentenced to death.
The issue of whether a statute can prohibit introduction of evidence related to voluntary intoxication was addressed by the Supreme Court of the United States in Montana v. Egelhoff , 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). The Supreme Court analyzed a Montana statute providing a defendant's voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense." Id. at 39-40, 116 S.Ct. 2013 (alteration in original). A majority of the Supreme Court concluded the statute did not violate the Constitution. Four justices agreed the statute did not violate due process or a defendant's right to present a defense because, historically, voluntary drunkenness has not uniformly been admissible as evidence. It is "normally within the power of the State to regulate procedures under which its laws are carried out." Id. at 43, 116 S.Ct. 2013 (internal quotation marks omitted). Accordingly, a state's decision regarding how to regulate such procedures "is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id. (internal quotation marks omitted).
Courts employ a historical analysis when determining whether a principle is fundamental. Id. Common law and Blackstone recognized intoxication "as an aggravation of the offence, rather than as an excuse for any criminal misbehaviour." Id. at 44, 116 S.Ct. 2013 (quoting 4 W. Blackstone, Commentaries *25-*26). "The historical record does not leave room for the view that the common law's rejection of intoxication as an 'excuse' or 'justification' for crime would nonetheless permit the defendant to show that intoxication prevented the requisite mens rea. " Id. at 45, 116 S.Ct. 2013. Egelhoff cites an 1858 opinion from this Court, which relied on the "true wisdom and sound policy" supporting the common law maxim disallowing consideration of voluntary intoxication as a defense or a method of negating mens rea. Id. at 46-47, 116 S.Ct. 2013 (quoting State v. Cross , 27 Mo. 332, 338 (1858) ).
*11 To look for deliberation and forethought in a man maddened by intoxication is vain, for drunkenness has deprived him of the deliberating faculties to a greater or less extent; and if this deprivation is to relieve him of all responsibility or to diminish it, the great majority of crimes committed will go unpunished.
Id. at 46, 116 S.Ct. 2013 (quoting Cross , 27 Mo. at 338 ).[7] The plurality of justices held that "disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue" is within the province of the states and "[n]othing in the Due Process Clause prevents them from doing so." Id. at 56, 116 S.Ct. 2013.
Justice Ginsburg concurred in the result, noting other state courts have upheld similar statutes restricting the consideration of voluntary intoxication, "not simply as evidentiary rules, but as legislative redefinitions of the mental-state element." Id. at 59, 116 S.Ct. 2013 (Ginsburg, J., concurring). "States enjoy wide latitude in defining the elements of criminal offenses, particularly when determining the extent to which moral culpability should be a prerequisite to conviction of a crime." Id. at 58, 116 S.Ct. 2013 (citations and internal quotation marks omitted). Justice Ginsburg specifically states the prosecution need not prove the mens rea in a deliberate homicide case "in a purely subjective sense." Id. "To obtain a conviction, the prosecution must prove only that (1) the defendant caused the death of another with actual knowledge or purpose, or (2) that the defendant killed under circumstances that would otherwise establish knowledge or purpose 'but for' [the defendant's] voluntary intoxication." Id. (internal quotation marks omitted). Effectively, a majority of the Supreme Court agreed statutes eliminating voluntary intoxication's relevance to the mens rea requirement do not violate a defendant's due process rights or right to present a defense.
This Court upheld the constitutional validity of MAI-CR 3d 310.50 in State v. Roberts , 948 S.W.2d 577 (Mo. banc 1997). The defendant in Roberts claimed the jury instruction relieved the State of its burden to prove all the elements of a crime, namely the requisite mental state. Id. at 590. Citing the Supreme Court's decision in Egelhoff , this Court upheld MAI-CR 3d 310.50. Id.
Collings's attorneys testified at the evidentiary hearing they were aware of the statute and jury instruction and chose not to focus on his degree of intoxication on the night of Ford's murder. One of his attorneys testified the defense did not consider hiring an expert to litigate the constitutionality of the statute and instruction. She stated she was "very loathed to argue to the jury anything about intoxication" because, in her experience, regardless of "how many times you tell them it's not an excuse," jurors will consider intoxication defenses an "excuse" and do not like such defenses. The defense ultimately concluded "it's a better strategy" to avoid the argument "he would never have done this if he hadn't been so drunk and so high."
*12 The effectiveness of counsel is "measured by what the law is at the time of trial." Hoeber v. State , 488 S.W.3d 648, 658 (Mo. banc 2016). Counsel is not required to predict changes in the law, and, "[a]s this Court has repeatedly held, a failure to anticipate a change in the law does not constitute ineffective assistance of counsel." Meiners v. State , No. SC96278, 540 S.W.3d 832, 841, 2018 WL 505352, at *6 (Mo. banc Jan. 23, 2018). Because the Supreme Court has upheld another state's similar voluntary intoxication statute and this Court has upheld the exact challenged jury instruction, this Court cannot find it was ineffective for Collings's trial and appellate counsel to not challenge the constitutional validity of section 562.076 and its corresponding jury instruction. It is apparent Collings's trial counsel were aware of section 562.076, its corresponding jury instruction, and existing case law from both the Supreme Court and this Court. Based on the attorneys' testimony, it is also clear they made a strategic choice based on experience not to focus on Collings's intoxication on the night of Ford's murder. Trial strategy decisions will only serve as a basis for an ineffective assistance of counsel claim if the decision was unreasonable. McLaughlin v. State , 378 S.W.3d 328, 337 (Mo. banc 2012). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." Strickland , 466 U.S. at 690, 104 S.Ct. 2052. Because Collings's trial counsel's decision not to investigate and present evidence challenging the constitutional validity of section 562.076 and the corresponding jury instruction was a strategic choice based on experience, the motion court did not clearly err in denying this claim of ineffective assistance of counsel.
II. Addiction and Childhood Trauma Expert
Collings's second point on appeal claims the motion court clearly erred in denying his claim that his trial counsel were ineffective for failing to call an expert psychiatrist to present mitigation testimony about addiction and childhood trauma. His trial counsel knew about his history of alcohol and drug addiction, as well as the emotional neglect and sexual abuse he suffered in childhood. Collings claims expert testimony from a board-certified forensic psychiatrist-such as Dr. Piasecki-about the impact these factors had on his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law would have provided the jury with additional mitigation information.[8] He argues there is a reasonable probability the jury would not have voted for death had his trial counsel called such an expert witness.
This Court has recognized, "In a death penalty case, trial counsel has an obligation to investigate and discover all reasonably available mitigating evidence." Davis v. State , 486 S.W.3d 898, 906 (Mo. banc 2016). "In performing the first part of the Strickland analysis, courts distinguish between actions that result from inadequate pretrial preparation and those that are the product of trial strategy decisions." Chambers v. Armontrout , 907 F.2d 825, 835 (8th Cir. 1990). "Ineffectiveness is generally clear in the context of complete *13 failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." Id.
At the evidentiary hearing, Collings's trial counsel testified about the defense's investigation into evidence supporting the statutory mitigating circumstance related to his substantially impaired capacity. In total, Collings's trial counsel hired eight different expert witnesses from the fields of psychiatry, psychology, neuropsychology, and neuroradiology, and experts on sex offenses and human development.[9] One of the experts hired was Dr. Draper, a human development educator. As explained above, Dr. Draper testified during the penalty phase of trial concerning Collings's emotional development and history of sexual abuse.
Despite Collings's argument to the contrary, it is clear his two trial counsel conducted a thorough investigation into possible mitigating circumstances prior to trial. They hired a total of eight experts with experience related to mental disorders and development before ultimately deciding to call only Dr. Draper as an expert witness to testify during the penalty phase of trial. As explained above, Collings's counsel also made a strategic decision not to focus on evidence of his drug and alcohol use as they believed such evidence and argument would antagonize the jury.
"Trial counsel's selection of which expert witnesses to call at trial is generally a question of trial strategy and is virtually unchallengeable." Davis , 486 S.W.3d at 906 (emphasis added). Collings's trial counsel's strategic decision about what mitigation evidence to present is not a proper basis on which to find ineffective assistance of counsel and to grant Collings postconviction relief. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.
III. Exclusion of Records
Collings's third point on appeal claims the motion court clearly erred in overruling his motion because appellate counsel was ineffective in failing to raise trial court error in excluding the records Dr. Draper relied on in making her conclusions. During the penalty phase, trial counsel attempted to admit various records Dr. Draper used to create her "Life Path" for Collings and formulate her opinions about his mental development.[10] The trial court excluded the records, sustaining the prosecution's hearsay and relevance objections. Nevertheless, the trial court allowed Dr. Draper to testify she reviewed the documents. Appellate counsel testified at the evidentiary hearing that, despite the defense's objection to the trial court's exclusion *14 of the records being preserved, she did not raise the issue on direct appeal. She lamented being close to the appellate brief word limit after addressing 10 points on appeal and decided against pursuing the issue after some research into the potential legal claim. Collings's appellate counsel also testified she believed, in hindsight, it was a mistake to not argue the issue.
"To prevail on a claim of ineffective assistance of appellate counsel, the movant must establish that counsel failed to raise a claim of error that was so obvious that a competent and effective lawyer would have recognized and asserted it." Williams v. State , 168 S.W.3d 433, 444 (Mo. banc 2005). "There is no duty to raise every possible issue asserted in the motion for new trial on appeal, and no duty to present non-frivolous issues where appellate counsel strategically decides to winnow out arguments in favor of other arguments." Tisius v. State , 519 S.W.3d 413, 431-32 (Mo. banc 2017). Additionally, the movant must prove, "if counsel had raised the claims, there is a reasonable probability the outcome of the appeal would have been different." Taylor v. State , 262 S.W.3d 231, 253 (Mo. banc 2008).
As a preliminary matter and in contrast to Collings's appellate counsel's testimony, this issue was not properly preserved for appeal. During the penalty phase, his trial counsel responded to the State's hearsay objection by arguing an expert may rely on hearsay to render her opinion. In his amended motion and on appeal, however, Collings alleged his trial counsel were ineffective for failing to argue the records were independently admissible as business records and court records. Because the argument on appeal was different than the argument at trial, this claim was not properly preserved for appellate review. See State v. Moore , 303 S.W.3d 515, 523 (Mo. banc 2010).
"Where an alleged error that was not raised was not preserved, the right to relief due to ineffective assistance of appellate counsel tracks the plain error rule and requires that the error not raised be so substantial as to amount to a manifest injustice or a miscarriage of justice." Anderson v. State , 196 S.W.3d 28, 36 (Mo. banc 2006). Under plain error review, this Court has the discretion to review unpreserved claims. Rule 30.20. To find a trial court plainly erred, the alleged error must be "evident, obvious, and clear" and provide "substantial grounds for believing a manifest injustice or miscarriage of justice occurred." State v. Smith , 522 S.W.3d 221, 231-32 (Mo. banc 2017).
Here, Collings's trial counsel conducted a thorough investigation into possible mitigation evidence and presented expert testimony addressing it. Dr. Draper testified about the relevant and admissible subject matter contained in the records related to Collings's emotional development and history of sexual abuse. As in McLaughlin , the records in this case would have offered duplicative, corroborating evidence for the mitigation expert testimony offered during the penalty phase. See 378 S.W.3d at 352, 354.
It is "not an abuse of discretion for the trial court to limit cumulative mitigation evidence." State v. Glass , 136 S.W.3d 496, 518 (Mo. banc 2004) (emphasis added). Accordingly, a defendant does not suffer manifest injustice when a trial court excludes cumulative evidence. See id. at 519. Because the jury was presented with the relevant information through Dr. Draper's testimony, it was not evident, obvious, and clear error for the trial court to have excluded the related documents that would have provided duplicative evidence.
*15 Collings has failed to show substantial grounds to believe a manifest injustice or miscarriage of justice occurred. Consequently, the motion court did not plainly err in denying this claim of ineffective assistance of counsel.
IV. Spears's Irreconcilable Confession
Collings's fourth point on appeal contends the motion court erred in denying his claim that trial counsel were ineffective in failing to present Spears's inconsistent and irreconcilable confession during the guilt phase of trial. He argues Spears's confession would have demonstrated police coercion in obtaining Collings's own confession and there was a reasonable probability the jury would not have convicted him of first-degree murder or would not have voted for death.
"Ordinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter of trial strategy." Tisius , 519 S.W.3d at 427. "If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such a witness does not constitute ineffective assistance." Id.
Defense counsel called Spears to testify, but he invoked his Fifth Amendment right outside the jury's presence and did not testify. Even though other testimony presented at trial informed the jury that Spears had confessed to being involved with Ford's murder, Collings argues the jury needed to hear Spears's actual confession in his own voice via his recorded statement to law enforcement. Otherwise, Collings suggests the jury could have believed law enforcement was using an interrogation tactic and simply told Collings that Spears had confessed in an effort to trick him into implicating himself.[11] The motion court denied the claim, finding trial counsel had a reasonable strategy for not wanting to introduce Spears's confession as it was not exonerating and, in reality, suggested more deliberation on Collings's part.
At the evidentiary hearing, one of Collings's trial counsel testified the defense "never wanted that jury to hear David Spears's statements at all for any reason." According to counsel, the defense strategy "was never going to be an innocence case" because Collings had made "too many statements in too great of detail." Consequently, the defense believed it was their best strategy to use his statements to argue for a second-degree murder conviction. Essentially, trial counsel believed they had a better chance of convincing the jury that Collings did not deliberate before killing Ford, but he only reacted once she recognized him after he sexually assaulted her.
As explained above, trial counsel's decision regarding trial strategy will only be deemed ineffective if the decision was unreasonable. McLaughlin , 378 S.W.3d at 337. Given the facts surrounding Collings's confession and the details contained therein, it was not unreasonable for his trial *16 counsel to argue for second-degree murder based on a lack of deliberation. As a result, it was not unreasonable for trial counsel to avoid Spears's statement suggesting more deliberation on Collings's part.
Further, the jury was presented with other evidence of Spears's statements implicating himself and Collings in Ford's murder. This Court has recognized, "Failure to present evidence that is cumulative to that presented at trial does not constitute ineffective assistance of counsel." Id. at 343. Accordingly, the motion court did not clearly err in denying this claim of ineffective assistance of counsel.
V. DNA Evidence
Collings's fifth point on appeal avers the motion court erred in denying his claim that trial counsel were ineffective in failing to challenge DNA evidence. At trial, a DNA analyst for the Missouri State Highway Patrol ("MSHP") testified she examined two hair roots found in the bed of Collings's truck, and a partial profile of the hair was consistent with Ford's DNA profile. Defense counsel were unable to open the file on the disk provided by the MSHP to access the raw data. Because of this inability to access the raw data, Collings's trial counsel did not hire their own DNA expert to challenge the MSHP analyst's findings.
At the evidentiary hearing, Collings offered testimony from a professor of molecular biosciences who reviewed the MSHP analyst's DNA lab report, worksheets, and electronic data disk. He testified the MSHP analyst's findings did not meet an accepted threshold and, if certain DNA evidence was accepted, Ford would be excluded from contributing DNA to the partial profile from the hair found in Collings's truck. Collings argues this proposed evidence would have cast further doubt on his own statements confessing to Ford's murder. Collings asserts there is a reasonable probability further scrutiny of the DNA evidence would have affected the jury's determination of guilt or the appropriate penalty. As a result, he concludes the motion court erred in denying his claim for ineffective assistance of counsel.
"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland , 466 U.S. at 691, 104 S.Ct. 2052.
Both of Collings's trial counsel testified at the evidentiary hearing they made repeated attempts to acquire the raw DNA data from the MSHP. Despite the MSHP providing multiple copies of the data disk, the defense counsel were never able to open the raw data files. Trial counsel testified they ran out of time and decided to focus cross-examination of the MSHP analyst on challenging the low number of DNA loci identified in the testing. Collings's counsel also asserted part of the defense strategy was to argue the presence of Ford's hair in Collings's truck was not incriminating as she and Spears would have been in Collings's truck during the normal course of visits.
Collings's trial counsel undertook reasonable efforts to investigate the DNA evidence and, as a result of technical difficulties and time limitations, decided to pursue alternative methods of cross-examination of the prosecution's DNA witness. Further, the strategy to explain the presence of Ford's DNA in Collings's truck as normal and non-incriminating was reasonable given the relationship between the parties involved. The motion court did not clearly *17 err in denying this claim of ineffective assistance of counsel.
VI. Computer Use Evidence
Collings's sixth point on appeal argues the motion court erred in denying his claim that trial counsel were ineffective in failing to investigate and present evidence showing internet history on Spears's computer during the guilt phase of trial. An internet history report showed intermittent use of a computer belonging to Spears and located at Spears's house from 1:54 a.m. to 3:36 a.m. on November 3, the morning after Ford's murder.[12] According to Spears's mother's testimony during the penalty phase of trial, she drove to Spears's house after he called her around midnight. She testified Spears left in his pickup truck after she arrived and returned a short time later. He drove her Suburban while she stayed at his house until he returned by 7 a.m. At the evidentiary hearing, Collings's trial counsel testified they received the internet history report and remembered Spears's mother indicating during her deposition that she only knew how to turn the computer on and off and play games. Collings contends this evidence would have cast doubt on the truth of his confessions to law enforcement because it suggests someone was in Spears's home on the night of Ford's murder. He claims there is a reasonable probability the jury would not have convicted him of first-degree murder.
Trial counsel is not ineffective for not offering evidence that would not have unqualifiedly supported the defense theory. See Tisius , 519 S.W.3d at 427. According to Spears's own confession, he was not at his home during the period in which the internet history report suggests someone was there. Collings told law enforcement that Mahurin and Spears left his home around 11:30 p.m., and he left for Spears's house shortly thereafter to get there before the other men. Consequently, the internet history report from 1:54 a.m. to 3:36 a.m. would not have supported the defense theory of events. Further, the internet history report could not have been used to impeach Spears's confession because, as explained above, Collings's trial counsel made a reasonable strategic decision to not focus on Spears's separate confession as they believed it suggested more deliberation on Collings's part. The motion court did not clearly err in denying postconviction relief on this claim.
VII. Cadaver Dog Evidence
Collings's seventh point on appeal claims the motion court erred in denying his claim that trial counsel were ineffective in failing to call Alicia Brown, a search and rescue dog handler, to testify during the guilt phase of trial. During the penalty phase, Brown testified two dogs trained to alert at the scent of human remains separately alerted on the driver's side door, left rear quadrant, driver's seat, and rear cargo area of Spears's mother's Suburban, but the dogs did not alert on Collings's truck. Collings claims there is a reasonable probability the jury would not have found him guilty of Ford's murder based on this testimony.
During the evidentiary hearing, Collings's trial counsel testified about their differing opinions concerning Brown's testimony about the cadaver dogs. His counsel responsible for the guilt phase wanted *18 to mention Spears as few times as possible, whereas his counsel responsible for the penalty phase wanted Brown to testify to cast doubt on Collings's sole involvement. As a result, Brown testified during only the penalty phase.
"Ordinarily the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel." Davis , 486 S.W.3d at 909. As explained above, Collings's trial counsel's strategic decision to not focus on Spears's statements to law enforcement was reasonable given Collings's detailed confessions to law enforcement. The jury was presented with Brown's testimony concerning the cadaver dogs during the penalty phase. If the jury had any doubt Collings was solely responsible for Ford's murder, there is a reasonable probability the jury would have voted to sentence him to life rather than death. Because the jury in fact voted to impose the death penalty after hearing Brown's testimony, there was not a reasonable probability the evidence would have resulted in a different verdict. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.
VIII. Proposed Witness Testimony about Events After the Murder
Collings's eighth point on appeal asserts the motion court erred in denying his claim that trial counsel were ineffective for failing to investigate and call Lisa Blevins, Spears's neighbor, as a witness during the guilt phase. At the evidentiary hearing, Blevins testified she could see Spears's front door from her front door and saw numerous people and vehicles coming and going from Spears's house almost every day at all hours of the day and night. She described it as a "party house" and the vehicles as having license plates from Oklahoma, Arkansas, and elsewhere. Blevins stated she was home the night of Ford's murder, November 2, and saw people at Spears's house working on a vehicle. She recounted hearing cars revving and tires squealing throughout the evening and it not stopping until close to daylight. Although the FBI interviewed Blevins, she was not contacted by anyone associated with Collings's defense team. Collings argues Blevins's testimony could have cast doubt on Collings's guilt as it suggests there were other people present at Spears's house on the night of Ford's murder.
At the evidentiary hearing, both of Collings's trial counsel admitted they were familiar with the FBI report of Blevins's interview. They recalled the interview report of Blevins detailing "druggies" constantly coming and going from Spears's house. Specifically, Blevins told the FBI that she left her home at approximately 3 p.m. on November 2 and did not return until 11:30 p.m. She claimed to hear a vehicle in the direction of Spears's house revving its engine very loudly between 1:30 a.m. and 2 a.m. on the morning of November 3. Based on the information contained in the FBI report, Collings's counsel testified they did not believe Blevins would have information beneficial to the defense and considered interviewing her "a very low priority."
For a movant to prove ineffective assistance of counsel for failure to call a certain witness at trial, the movant must establish: "(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." Davis , 486 S.W.3d at 909 (internal quotation marks omitted).
Collings has not shown Blevins's testimony would have provided a viable defense.
*19 According to the evidence offered at trial, Mahurin and Spears left Collings's home around 11:30 p.m. Collings left shortly thereafter for Spears's house. Mahurin dropped Spears off and returned to his home by midnight. Consequently, Blevins's testimony about what she heard between 1:30 a.m. and 2 a.m. would not have provided a viable defense. Additionally, the motion court noted Blevins told the FBI during her interview she could hear vehicles, but she could not identify their location despite her testimony at the evidentiary hearing that she could see the vehicles at Spears's house. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.
IX. Proposed Witness Testimony about Events Prior to the Murder
Collings's ninth point on appeal contends the motion court erred in denying his claim that trial counsel were ineffective in failing to investigate and call Joni Blake, another of Spears's neighbors, as a witness during the guilt phase. At the evidentiary hearing, Blake said Spears lived "catty-corner" directly behind her and she could see the front of his home from hers, although she admitted to not personally knowing him. On November 2, Blake and two co-workers were on their way to work between 10 and 11 p.m. and stopped at a convenience store. Blake testified she stayed in the car and saw Spears sitting in the back of a gray car, possibly a Mercury or Lincoln, with Arkansas license plates in the parking lot. She noted he was shirtless despite it being a cold November evening. Collings, whom Blake had never met, came out of the store and sat in the passenger seat. Blake testified Collings gave her and her co-workers a weird look that made them uncomfortable. When she returned home at 7:30 a.m. the next day, she saw the same gray car in Spears's driveway. Blake was later interviewed by the FBI, but she was never contacted by Collings's defense team.
At the evidentiary hearing, Mahurin testified he was with Collings and Spears the evening of November 2 and was driving a 1996 green Eagle Vision. Further, when asked if the car had Arkansas license plates, Mahurin replied, "Not that I'm aware of." Mahurin admitted to buying alcohol at the convenience store multiple times that evening. His testimony at the evidentiary hearing was substantially similar to his trial testimony, except he did not state the color of his car at trial. His trial counsel testified to having received the report of the FBI's interview with Blake. Both attorneys, however, stated there was no strategy for choosing not to interview Blake. Because Blake's testimony would have conflicted with Mahurin's, Collings argues his trial counsel was ineffective in not calling her as a witness.
As explained above, a movant claiming ineffective assistance of counsel for failing to call a specific witness during trial requires the movant to prove the proposed witness's testimony would have provided a viable defense. Davis , 486 S.W.3d at 909. Collings has not shown that Blake's proposed testimony would have provided a viable defense. At the evidentiary hearing, Blake did not recall the license plates but said she probably told the FBI at the time if that is what the report indicated. Mahurin, too, was equivocal at the hearing: when asked if the green Eagle Vision had Arkansas license plates, he replied, "Not that I'm aware of." Additionally, Collings failed to prove the car color could have been perceived differently or that Blake could have mistaken Spears's mother's green vehicle that Ford's mother drove to work the morning of November 3 for the vehicle she saw the night before. Everyone agreed Collings, Spears, and Mahurin were out buying alcohol at that time of *20 night. As a result, there is not a reasonable probability that any potential discrepancies in the exact description of the vehicle would have undercut the otherwise corroborating testimony concerning the November 2 activities of the three men. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.
X. Calling Collings's Stepmother in Penalty Phase
Collings's tenth point on appeal contends the motion court erred in denying his claim that trial counsel were ineffective in failing to call Julie Pickett, Collings's stepmother, as a witness during the penalty phase. Pickett married Collings's biological father when he was eight or nine years old, and he came to live with them in Arkansas when he was 18. As a result, she developed a close relationship with Collings. He argues Pickett would have provided important mitigation testimony highlighting the severity of Collings's alcohol addiction and history of sexual abuse.
Collings's trial counsel originally planned to call Pickett as a witness during the penalty phase, but Collings's biological father and brother and two of his adoptive siblings had already testified during the penalty phase about Collings's childhood. Any testimony from his stepmother would have been cumulative to the testimony provided by other members of Collings's family and the testimony from Dr. Draper. Collings's trial counsel's decision to not call Pickett was also a strategic decision based on events of the day of her planned testimony after Collings's biological father, Pickett, and possibly other family members ran into the jury in a hallway at the courthouse and engaged in a verbal exchange. Collings's counsel directed his family from Arkansas be excluded from the courthouse and told an investigator to tell the family members they were no longer needed and to return to Arkansas. This strategic decision was not unreasonable and does not constitute ineffective assistance of counsel. See McLaughlin , 378 S.W.3d at 337. Because this Court has recognized "[f]ailure to present evidence that is cumulative to that presented at trial does not constitute ineffective assistance of counsel," id. at 343, the motion court did not clearly err in denying this claim of ineffective assistance of counsel.
XI. Calling Collings's Stepbrother-in-Law in Penalty Phase
Collings's eleventh point on appeal asserts the motion court erred in denying his claim that trial counsel were ineffective in failing to investigate and call Bobby Thomas, Collings's stepsister's husband, as a witness during the penalty phase. Collings lived with the Thomas family for about two years and developed a good relationship with Thomas and his daughters. At the evidentiary hearing, Thomas testified he attempted to commit suicide in 2003 when he and his wife were going through a bad time. Collings found Thomas hanging by a rope around his neck in their basement and elevated his body until someone else arrived to cut the rope. Collings argues if his trial counsel would have investigated and called Thomas to testify, there is a reasonable probability his story would have convinced the jury to vote for life imprisonment.
As explained above, to prove ineffective assistance of counsel for failure to call a certain witness at trial, a movant must establish: "(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." Davis , 486 S.W.3d at 909 (internal *21 quotation marks omitted). At the evidentiary hearing, Collings's trial counsel testified that they were unware of Thomas or the story about his suicide. Collings, however, notes Dr. Draper made a specific reference in her "Life Path" regarding Collings that he "saved a man from hanging himself," but she did not identify Thomas as the man. Despite demonstrating his counsel were aware of his saving a man's life, Collings fails to point to any evidence his trial counsel were made aware of Thomas's potential testimony. This Court finds there was no reasonable probability Thomas's proposed testimony would have changed the jury's vote for death. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.
XII. Challenge to Torture Aggravating Circumstance
Collings's twelfth and final point on appeal claims the motion court erred in denying his claim that appellate counsel was ineffective in failing to raise a claim on appeal that Instruction 16 offered by the State and given to the jury was erroneous for not defining the statutory aggravating circumstance "torture" as the term is vague. Pursuant to section 565.032.2(7), a jury can recommend the death penalty if it finds the "murder in the first degree was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." At the conclusion of the penalty phase, the jury was instructed to consider whether one or more of the following statutory aggravating circumstances existed in assessing the proper punishment:
1. Whether the murder of Rowan Ford involved torture and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman.
2. Whether the murder of Rowan Ford was committed while the defendant was engaged in the perpetration of rape.
3. Whether Rowan Ford was a potential witness in a pending investigation of the rape of Rowan Ford and was killed as a result of her status as a potential witness.
Collings's trial counsel objected to the instruction, arguing there was not sufficient evidence to submit the "torture" instruction as "torture" was not defined. Without such a definition, trial counsel claimed the jurors would be "without guidance" and could "individually decide what torture is." The trial court overruled the objection, and the jury found the first and third aggravating circumstances beyond a reasonable doubt, recommending the death penalty. Collings argues his appellate counsel was ineffective for not raising a claim that the "torture" aggravator is unconstitutionally vague.
At the evidentiary hearing, Collings's appellate counsel testified she considered raising an issue addressing the constitutional validity of the "torture" aggravating circumstance, but she ultimately decided against including it in her initial brief due to the word limit and the 10 other claims of error she already had briefed. She did, however, include language addressing the lack of definition and potential unconstitutional vagueness in her reply brief when arguing Collings's sentence was disproportionate.
As explained above, a movant must establish appellate counsel "failed to raise a claim of error that was so obvious that a competent and effective lawyer would have recognized and asserted it" in order to prevail on a claim of ineffective assistance of appellate counsel. Williams , 168 S.W.3d at 444. Additionally, this Court has recognized appellate counsel has "no duty to raise every possible issue asserted in the *22 motion for new trial on appeal, and no duty to present non-frivolous issues where appellate counsel strategically decides to winnow out arguments in favor of other arguments." Tisius , 519 S.W.3d at 431-32.
The motion court found Collings's appellate counsel's decision to not raise the constitutional claim in a separate point on appeal and, rather, address the issue in the claim regarding proportionality of the punishment, was a reasonable strategic decision. In addition, Collings fails to cite to any case law supporting his argument that the "torture" aggravating circumstance is unconstitutionally vague. He relies on cases addressing the vagueness of the "depravity of mind" aggravating circumstance and the need for instructions providing definitions to juries. See, e.g. , Godfrey v. Georgia , 446 U.S. 420, 427-32, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion); State v. Preston , 673 S.W.2d 1, 10-11 (Mo. banc 1984). Despite his attempt to analogize "depravity of mind" to "torture," the cases he cites suggest the opposite conclusion. For example, this Court in Preston noted "infliction of physical or psychological torture upon the victim" has been recognized as a factor to be considered when finding "depravity of mind."[13] 673 S.W.2d at 11. Because there is case law supporting the use of "torture" as a sufficient definition in and of itself, it cannot be said Collings's appellate counsel was ineffective for failing to raise a constitutional claim of vagueness.
The effectiveness of counsel is "measured by what the law is at the time of trial." Hoeber , 488 S.W.3d at 658. As a result, counsel is not ineffective "for failing to anticipate a change in the law." Id. Because Collings does not cite to case law supporting his argument that "torture" as used in section 565.032.2(7) and the jury instruction is unconstitutionally vague, he did not meet his burden of establishing that any competent and effective lawyer would have made such a novel constitutional claim on appeal. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.
Conclusion
The motion court's findings of fact and conclusions of law are not clearly erroneous. Accordingly, its judgment overruling Collings's motion and denying postconviction relief is affirmed.
All concur.

All statutory references are to RSMo 2000 unless otherwise indicated.

Spears said he was the one to put the rope around Ford's neck and strangled her after Collings told him it had to be done.

Collings's foster (later adoptive) parents suffered a traumatic loss of a child and later divorced. Also, his biological parents had sporadic contact with him for many years, which resulted in him being shuffled between his biological and adoptive parents.

This Court has appellate jurisdiction pursuant to article V, section 10 of the Missouri Constitution. See also Standing Order, June 16, 1988 (effective July 1, 1988).

Dr. Piasecki explained these changes show up on neuroimaging in the form of decreased metabolism in the brain's frontal lobe, showing less activity than normal.

According to Dr. Piasecki, the brain's prefrontal cortex-which is responsible for decision making, judgment, consequential thinking, impulse control, organization, planning, and emotion control-is progressively compromised with increasing levels of alcohol.

Egelhoff goes on to cite the following policies behind the common law rule prohibiting consideration of voluntary intoxication:
Disallowing consideration of voluntary intoxication has the effect of increasing the punishment for all unlawful acts committed in that state, and thereby deters drunkenness or irresponsible behavior while drunk. The rule also serves as a specific deterrent, ensuring that those who prove incapable of controlling violent impulses while voluntarily intoxicated go to prison. And finally, the rule comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences.
518 U.S. at 49-50, 116 S.Ct. 2013.

Collings argues such expert testimony would have provided support for the statutory mitigation factor established in section 565.032.3(6): "The capacity of the defendant to appreciate the criminality of his [or her] conduct or to conform his [or her] conduct to the requirements of law was substantially impaired." He cites additional non-statutory mitigation factors, including difficult childhood or abusive background, history of substance abuse or intoxication, and the defendant's mental and emotional development.

A neuropsychologist gave Collings's trial counsel recommendations about the direction they should pursue. His trial counsel asked for a consultation with another psychologist, who had experience with fetal alcohol syndrome. Defense counsel also hired a forensic psychiatrist and an expert on sex offenses. Consultation with the sex offenses expert led trial counsel to hire a neuroradiologist to conduct scans of Collings's brain to look for evidence of possible brain damage caused by his drug and alcohol use. The scans, however, did not reveal any brain damage. Trial counsel also consulted a specialist on gigantism as both Collings and his father had acromegaly, a disorder that develops from the pituitary gland producing excess growth hormone. The defense also hired a mental health expert to assess Collings while he was incarcerated after a change in his behavior made them concerned for his well-being.

These records included documents related to Collings's medical history, hospital visits, parents' divorce, adoption, schooling, and employment history.

Collings asserts Spears's confession would not be offered for its truth, thereby avoiding a hearsay challenge. Rather, he asserts his trial counsel should have admitted it to cast doubt on his own recorded confessions to law enforcement as Spears's version of events was inconsistent and irreconcilable with his own. The State, however, notes Collings suggested Spears's confession should have been offered during the penalty phase as mitigating evidence demonstrating Collings did not plan Ford's death alone. If used in that manner, the State concludes, Spears's recorded confession would in fact be admitted for its truth and would, therefore, be inadmissible hearsay. Because this Court holds the motion court did not err in denying this claim of ineffective assistance of counsel, it need not reach a conclusion about this particular hearsay argument.

The internet history report showed that Spears's computer was used to go to different pages on MySpace for 14 minutes between 1:54 a.m. and 2:08 a.m. A single MySpace profile was viewed at 2:40 a.m. The computer was later used for four minutes from 3:05 a.m. to 3:09 a.m. and then again from 3:32 a.m. to 3:36 a.m.

The defendant in Preston , after stabbing the victims to death, dipped the fried chicken the defendant was eating into the victims' blood. 673 S.W.2d at 11.